CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

MARSHALL H. SILVERBERG #5111
Assistant U.S. Attorney
NICOLE K. HUDSPETH #11079
Special Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96580
Telephone: (808) 541-2850
Facsimile:  (808) 541-2958
E-mail:  Marshall.Silverberg@usdoj.gov
        Nicole.Hudspeth@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 19-00046 LEK |
| | ) | |
| Plaintiff, | ) | The Government's Trial Brief; |
| | ) | Trial Exhibits 7, 12, 13, 19-22, |
| vs. | ) | 25-32; Certificate of Service |
| | ) | |
| CHARLES KIMO BROWN, | ) | Bench Trial Date:  April 5, 2022 |
| | ) | Time:  9:00 a.m. |
| Defendant. | ) | Judge:  Hon. Leslie E. Kobayashi |
| | ) | |

**THE GOVERNMENT'S TRIAL BRIEF**

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ....................................................................................i-iii

I.    INTRODUCTION ...........................................................................................1

II.   INDICTMENT  ...............................................................................................1

III.  FACTS  ...........................................................................................................2

IV.   ELEMENT OF OFFENSES  ...........................................................................9

    A. Counts 1 and 3: Violations of 29 U.S.C. § 439(c) ....................................9

    B. Elements of 1 and 3  ................................................................................10

    C. Counts 2 and 4: Violations of 29 U.S.C. § 501(c) ...................................14

    D. Elements of 2 and 4 .................................................................................15

V.    PROOF OF OFFENSES ...............................................................................17

VI.   OTHER POTENTIAL EVIDENTIARY ISSUES  ........................................19

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                          <u>Page(s)</u>

*United States v. Campbell*, 42 F.3d 1199 (9th Cir. 1994) ....................................... 6

*United States v. Chittenden*, 530 F.2d 41 (5th Cir. 1976) ....................................... 9

*United States v. Dressel*, 625 F. Appx 583 (3d Cir. 2015) .................................... 14

*United States v. Johnson*, 529 F. Appx. 846 (9th Cir. 2013) ................................. 15

*United States v. Morales*,108 F.3d 1031 (9th Cir. 1997) ....................................... 13

*United States v. Ottley*, 509 F.2d 667 (2d Cir. 1975) ............................................. 9

*United States v. Thordarson* , 646 F.2d 1323 ....................................................... 16

*United States v. Wiseman*, 274 F.3d 1235 (9th Cir. 2001) ............................. 14, 17

<u>Statutes</u>                                                                      <u>Page(s)</u>

18 U.S.C. § 641 ........................................................................................ 16

19 U.S.C. § 439(c) ................................................................................... 13

29 U.S.C. 402(c) ...................................................................................... 11

29 U.S.C. § 402(a) ................................................................................... 11

29 U.S.C. § 402(i) .................................................................................... 11

29 U.S.C. § 402(n) ..................................................................................... 6

29 U.S.C. § 431(b) ................................................................................... 10

29 U.S.C. § 436 ............................................................................... 9, 10, 11

29 U.S.C. § 439(c) .......................................................................... 1, 9, 13

29 U.S.C. § 501(c) ........................................................................ 1, 14, 16

Fed. R. Evid. 803(6) ................................................................................ 19

Fed. R. Evid. 1006 .................................................................................. 19

## I.   <u>Introduction</u>

In accordance with the Report of the Final Pretrial Conference (Dkt. 53, PageID# 117), the Government hereby files its Trial Brief.  The intent of this Trial Brief is to provide the Court a summary of the charges in the Indictment; facts the Government anticipates adducing at trial; the elements of the offenses charged in the Indictment; and a discussion of legal issues that may arise during the trial.

## II.   <u>The Indictment</u>

Counts 1 and 3 of the Indictment charge the defendant, Charles Kimo Brown, ("Mr. Brown") with making false entries in records required to be kept by his union, the Hawaii Longshore Division of International Longshore & Warehouse Union (ILWU), Local 142, in violation of 29 U.S.C. § 439(c).  Counts 2 and 4 charge Brown with embezzling union funds relating to those two false entries, in violation of 29 U.S.C. § 501(c).

The crimes charged in the Indictment were part of a much longer and lucrative scheme engaged in by Mr. Brown, beginning at the end of 2009 and continuing until April 21, 2014, whereby Mr. Brown allegedly stole about $100,000 from the Hawaii Longshore Division of ILWU Local 142.  The Government did not seek additional counts relating to the earlier thefts and false entries because they were time-barred by the five-year statute of limitations on the day the case was presented to the grand jury (April 11, 2019).

### III.   <u>Facts</u>

From December 21, 2009, until he resigned on June 2, 2014, Mr. Brown was the Secretary-Treasurer of the Hawaii Longshore Division, an autonomous subdivision of Local 142 of the International Longshoremen and Warehouse Union (ILWU) ("the Longshore Division" or "the union").  In this capacity, Mr. Brown was a union officer and responsible for the books and records and financial filings of the Longshore Division.  That job, while it potentially could be considered a full-time job, was *not* a full-time job for Mr. Brown.

Instead, Mr. Brown also worked as a machine operator for a company called McCabe Hamilton & Renney, Co., Ltd. ("McCabe").  McCabe, according to its website, is Hawaii's oldest stevedore company.  McCabe's employees would unload ships bringing merchandise into Hawaii and load ships transporting merchandise to other ports in the United States and abroad.  From the end of 2009 until 2014, all of McCabe's workers who helped to unload and load the mercantile ships were unionized members of the Longshore Division.

As a machine operator for McCabe, Mr. Brown was tasked with driving a variety of vehicles around the Honolulu docks.  During December 2009-April 2014, Mr. Brown was one member of a group of 14 machine operators which, according to its contract with McCabe, could work as many as 12 hours at a time (extra hours could be worked during "emergencies").

McCabe had two such groups, one which worked daylight hours and one which worked at nighttime.  The nighttime group was guaranteed overtime pay, which amounted to the regular ("straight time") hourly pay plus an additional 50 percent; in other words, "time and a half" wages.

Mr. Brown, as the Secretary-Treasurer of the Longshore Division, could have been paid a full-time salary by the union.  Instead, the union decided to pay him what is called "lost-time" wages.  That is, if Mr. Brown, on a particular day, *could have* worked 10 hours for McCabe, but did not do so because he was doing his union work (i.e., he "lost the time" Mr. Brown could have worked for McCabe), the union (and not McCabe) compensated Mr. Brown at the same rate and for the same hourly time period (irrespective of the actual time worked by Mr. Brown on union matters) as if Mr. Brown had worked the 10 hours for McCabe.

This compensation arrangement was undoubtedly (and legitimately) beneficial to Mr. Brown.   For example, if, on a particular day, he only worked five hours during daylight time for the union, but he could have worked 10 hours at night at the overtime rate (because his gang worked 10 evening hours that night for McCabe), the union would pay Mr. Brown for 10 hours of work at the overtime rate (which, as noted above, was 1.5 times that of the straight time, i.e., regular daylight time) that McCabe paid its machine operators, even though Mr. Brown had only worked five hours for the union during daylight hours.

In addition, while the union generally did not work on the weekends, McCabe's employees often did work on the weekends, unloading and loading ships. If Mr. Brown was eligible by McCabe to work during the weekends, then he could lawfully do so, and collect both the union "lost-time pay" he had earned for doing union work during the week[1] and the weekend overtime wages from McCabe. In that sense, Mr. Brown had two jobs—one for the union and one for McCabe. For example, in 2012, Mr. Brown was paid $110,497 by the union and $35,038.45 from McCabe; and in 2013, Mr. Brown earned $112,532 from the union and $35,038.45 from McCabe.

In any event, before the union could pay Mr. Brown for his "lost-time" wages, it had to know how much Mr. Brown could have earned that day if he had, instead, worked for McCabe. The way the union was supposed to learn this information was for Mr. Brown to ask McCabe how much lost time he was owed, and then Mr. Brown or his secretary was supposed to complete a Wage Voucher form, indicating the number of hours he could have worked at McCabe, whether those hours were supposed to be compensated to him at the "straight time" (S.T.) or overtime (O.T.) rate, and for which days he was being compensated. The Government has attached two such Wage Voucher forms to this memorandum.

---

1 The union's agreement to pay the Secretary-Treasurer (and two other officers) "lost-time pay" is set forth in the union's bylaws, Trial Exhibit 7 at page 9.

Trial Exhibit 12 is the Wage Voucher form for the week beginning Monday, April 7, 2014, through April 11, 2014.  It reflects at the top, Mr. Brown's name and his mailing address.  In order to determine whether Mr. Brown accurately reported his "lost-time" hours to the union on the Wage Voucher form marked as Trial Exhibit 12, the Government compared it to the "logbook" maintained by McCabe for all of its machine operators, including Mr. Brown.  Trial Exhibit 19 is the relevant portion of the McCabe logbook for the week of April 7, 2014, which records the hours worked for its machine operators like Mr. Brown.  The Government anticipates that it will call Kevin Cutter to authenticate and testify about the McCabe logbook.  During the relevant time period, the end of December 2009 through April 21, 2014, Mr. Cutter was a dispatcher for McCabe.  Today, he is McCabe's Vice President of Operations.  He is very familiar with the logbook maintained by McCabe reflecting Mr. Brown's "lost-time."

Mr. Cutter is expected to testify that from 2009-2014, Mr. Brown telephoned the McCabe office on the weekends to inquire as to what his (Mr. Brown's) lost-time hours were for the past week.  Mr. Cutter usually was the McCabe dispatcher working on the weekends.  After being called by Mr. Brown, Mr. Cutter would then consult with the logbook and inform Mr. Brown of the number of lost-time hours Mr. Brown was entitled to claim for the preceding week.  Mr. Brown was then supposed to report those lost-time wages to the union for payment.

For the week beginning **April 7, 2014**, Trial Exhibit 12 is Mr. Brown's Wage Voucher for that week.  Trial Exhibit 19 is the page of McCabe's logbook for that same week.  For Monday, April 7, 2014, the Wage Voucher submitted by Mr. Brown claimed that he was entitled to 14.5 hours of overtime; however, the logbook maintained by McCabe provides that Mr. Brown was entitled only to 9 hours of overtime, a difference of 5.5 hours.  And because overtime was compensated at 1.5 times $37.50, or $56.25, the 5 extra hours Mr. Brown charged the union cost it an additional total of $309.37.

With respect to Tuesday, April 8, 2014, Mr. Brown claimed (Trial Exhibit 12) that he was entitled to 10 hours of overtime.  The logbook (Trial Exhibit 19) reveals that Mr. Brown was correct and there was no overcharge for that day.

With respect to Wednesday, April 9, 2014, Mr. Brown claimed that he was entitled to 11.5 hours of overtime.  A comparison with the logbook (Trial Exhibit 19) reveals that Mr. Brown was entitled only to 10 hours of overtime, and he overcharged the union 1.5 hours, for a gain of $84.38 (1.5 times $56.25).

With respect to Thursday and Friday, April 10, 2014, and April 11, 2014, in comparing what Mr. Brown claimed (Trial Exhibit 12)—10 hours of overtime—to what he was entitled (Trial Exhibit 19), both documents reflect 10 hours of overtime, so no overcharges were claimed for those two days.

The overcharges claimed for the week of April 7-11, 2014, are summarized in Trial Exhibit 21.  It reflects the overcharge of $309.37 for Monday, April 7, 2014, and the overcharge of $84.38 for Wednesday, April 8, 2014, for a total overcharge of $393.75 for that week.  That is why the Indictment charges an embezzlement of $393.75 in Count 2 of the Indictment.

For the week beginning **April 14, 2014**, Mr. Brown allegedly overcharged the union in four of the five days.  As set forth on Trial Exhibit 13, for Monday, April 14, 2014, Mr. Brown claimed 14.5 hours of overtime when, according to the McCabe logbook for that week (Trial Exhibit 20), he was entitled to only 10 hours of overtime, for an overcharge of 4.5 hours of overtime, totaling $253.12.  For Tuesday, April 15, 2014, Mr. Brown claimed 10 hours of overtime (Trial Exhibit 13) when, according to the McCabe logbook (Trial Exhibit 20), he would not have worked at all on that day, resulting in an overcharge of 10 hours, totaling $562.50.  For Wednesday, April 16, 2014, Mr. Brown claimed 11.5 hours of overtime when, according to the McCabe logbook, he was entitled to only 10 hours of overtime, resulting in an overcharge of 1.5 hours, totaling $84.38.

With respect to Thursday, April 17, 2014, Mr. Brown correctly claimed 10 hours of overtime. (Compare Trial Exhibit 13 to Trial Exhibit 20).

With respect to Friday, April 18, 2014, Mr. Brown claimed (Trial Exhibit 13) he was entitled to 10 hours of overtime when he was entitled to only 5 hours of

overtime according to the McCabe logbook (Trial Exhibit 20), resulting in an overcharge of 5 hours, totaling $281.25.

The summary table for the week of April 14-18, 2014, is Trial Exhibit 22. It reflects the overcharges for the days of April 14, 15, 16, and 18. It reflects that for the week of April 14-18, 2014, Mr. Brown embezzled $1,181.25, from his union and that is why that amount appears in Count 4 of the Indictment.

But that is just a small portion of the total embezzlements allegedly committed by Mr. Brown. If the Court permits the Government to present Mr. Brown's entire scheme to defraud the union, it began on or about December 31, 2009, only about 10 days after Mr. Brown was installed as the Secretary-Treasurer of the union.

The Government has painstakingly gone through each of the Wage Vouchers submitted by Mr. Brown in 2009-2014 to the union and compared them with the logbook maintained by McCabe, and concluded that Mr. Brown stole about $100,000 from the union for the years 2009-2014. The evidence is material to prove Mr. Brown's plan, opportunity, intent, absence of mistake, and lack of accident.

IV.    **Elements of the Offenses**

A. **Counts 1 and 3: Violations of 29 U.S.C. § 439(c)**

Title 29, United States Code, Section 439(c), provides in pertinent part:

> Any person who willfully makes a false entry in . . . any books, records, reports, or statements required to be kept by any provision of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

29 U.S.C. § 439(c).

The types of records required to be kept by the subchapter referenced in 29

U.S.C. § 439(c) are set forth in 29 U.S.C. § 436:

> Every person required to file any report under this subchapter shall maintain records on the matters required to be reported which will provide in sufficient detail the necessary basic information and data from which the documents filed with the Secretary [of Labor] may be verified, explained, or clarified, and checked for accuracy and completeness, **and shall include vouchers**, worksheets, receipts, and applicable resolutions, and shall keep such records available for examination for a period of not less than five years after the filing of the documents based on the information which they contain.

29 U.S.C. § 436 (emphasis added).

Mr. Brown, as the Secretary-Treasurer of the Longshore Division, was a

"person" within the meaning of 29 U.S.C. § 436. *See United States v. Chittenden*,

530 F.2d 41 (5th Cir. 1976); *United States v. Ottley*, 509 F.2d 667, 672 n. 8 (2d Cir.

1975).

### B.  The Elements of Counts 1 and 3

The elements of the offenses charged in Counts 1 and 3 are as follows:

First, that the Hawaii Longshore Division of the ILWU, Local 142, was a "labor organization" required to file annual reports with the Secretary of Labor and to keep records on matters required to be reported in the annual reports.

Second, Wage Vouchers were records required to be kept by the Hawaii Longshore Division under Title 29, United States Code, Section 436.

Third, that on or about the dates charged in Counts 1 and 3 in the Indictment, Mr. Brown made or caused another to make false entry(ies) in the Wage Vouchers.

Fourth, Mr. Brown acted willfully in making the false entry or entries on the Wage Vouchers.

As to the first element, the federal labor statutes in this case provide that if the Hawaii Longshore Division was a "labor organization engaged in an industry affecting interstate or foreign commerce," then it was required to file with the U.S. Department of Labor an annual financial report (called an LM-2) for each of its fiscal years.  The federal labor statutes also require that such LM-2 reports disclose for each fiscal year, the salary, allowances and other direct or indirect disbursements (including reimbursed expenses) made to each officer and to each employee who receives more than $10,000 from such labor organization during that fiscal year.  *See* 29 U.S.C. § 431(b) (content of required LM-2 reports).

A "labor organization" is an organization of any kind, engaged in an industry affecting commerce in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment.  *See* 29 U.S.C. § 402(i) (definition of "labor organization").

A labor organization is engaged in an industry affecting commerce if it is a labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce.  The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce.  See 29 U.S.C. 402(c) (definition of "an industry affecting commerce").  The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.  *See* 29 U.S.C. § 402(a) (definition of "commerce").

Therefore, if the Court finds beyond a reasonable doubt that the Hawaii Longshore Division represented or actively sought to represent employees in their dealings as union members with employers, including, but not limited to, McCabe Hamilton & Renny Co., Ltd., and that such employers were engaged in business operations which included the purchase of products or services created outside the

11

State of Hawaii, or the sale of products or services created within Hawaii and shipped to other states or foreign countries, then it should find that the Hawaii Longshore Division was a labor organization engaged in an industry affecting commerce.

Further, if the Court finds that the Hawaii Longshore Division was a labor organization engaged in an industry affecting commerce, then it should further find, as a matter of law, that it was required to file annual financial reports, i.e., LM-2s, with the U.S. Department of Labor and to keep records required to be reported in such reports.

As to the second element of the crimes alleged in Counts 1 and 3—whether Mr. Brown's Wage Vouchers were required to be kept by the Hawaii Longshore Division—the labor laws, as quoted above, specifically includes "vouchers" in the list of items which must be maintained by unions. *See* 29 U.S.C. § 436. By requiring unions to maintain such records, this would enable the U.S. Department of Labor to audit a particular union and compare the vouchers with the LM-2s with respect to the salaries and other monies declared paid to union officers and employees. Thus, if the Court finds that Mr. Brown's Wage Vouchers for the two weeks in April 2014 which are charged in the Indictment were "vouchers" within the meaning of "voucher" as defined in 29 U.S.C. § 436, then the second element for both Counts 1 and 3 has been met.

As to the third element of Counts 1 and 3, an entry on a Wage Voucher was "false" if it was untrue when it was made, and was then known to be untrue by Mr. Brown or by a person he caused to make it. An entry on the Wage Voucher was false if it recorded an event which did not occur, or it represented a fact to exist which did not exist.

As to the fourth element of Counts 1 and 3, the Government must prove beyond a reasonable doubt that Mr. Brown was a person who willfully made or caused to be made false entries in the Wage Vouchers as alleged in Counts 1 and 3. For purposes of these counts, a false statement is "willfully" made or caused to be made if done deliberately and intentionally and not through ignorance, mistake or accident. That is clear from *United States v. Morales,* 108 F.3d 1031, 1037 (9th Cir. 1997), where the defendant was convicted of two misdemeanor counts of willfully making false entries in a union ledger in violation of 19 U.S.C. § 439(c). *Id.* at 1033. The Ninth Circuit found that "[t]o convict Morales under 29 U.S.C. § 439(c), the government had to prove that she *willfully* made false bookkeeping entries. Willfulness requires that an act be done knowingly and intentionally, not through ignorance, mistake or accident." *Id.* at 1036-47. In other words, the Government has to prove that Mr. Brown "had to *know* that [his entries on the two Wage Voucher forms] were false." *Id.* at 1037.

## C. **Counts 2 and 4: Violations of 29 U.S.C. § 501(c)**

Title 29, United States Code, Section 501(c), provides in pertinent part:

Any person who embezzles or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C. § 501(c).

"The prohibition against the embezzlement of union funds under section 501(c) is designed to create a 'broad prohibition on pilfering union funds' and punish 'unconventional chicanery' by reaching novel schemes and closing the 'gaps and crevices' from which other statutes had allowed 'guilty men to escape through the breaches.'" *United States v. Dressel*, 625 F. Appx 583, 586 (3d Cir. 2015) (citations omitted). "A conviction under section 501(c) requires a misuse of union funds with fraudulent intent." *Id.* at 587. "Fraudulent intent exists where a union officer or employee takes union funds 'knowing that the [union] would not have wanted that to be done.'" *Id.* (citations omitted). Determining whether there was sufficient evidence of fraudulent intent requires an examination of the totality of circumstances. *Id.*

"Intent to repay generally is not a defense to embezzlement. . . ." *United States v. Wiseman*, 274 F.3d 1235, 1241 (9th Cir. 2001) (citations omitted). "Nor is it a defense to conversion." *Id.* (citations omitted).

14

### D. **The Elements of Counts 2 and 4**

The elements of the offenses charged in Counts 2 and 4 are as follows:

First, that the Hawaii Longshore Division of the ILWU, Local 142, was a "labor organization engaged in an industry affecting interstate or foreign commerce."

Second, Mr. Brown was an officer of the Hawaii Longshore Division.

Third, on or about April 14, 2014 (with respect to Count 2) and on or about April 21, 2014 (with respect to Count 4), Mr. Brown knowingly embezzled or converted to his own use monies or funds of the Longshore Division; and

Fourth, Mr. Brown acted unlawfully, willfully, and with the fraudulent intent to deprive the Hawaii Longshore Division of its monies or funds.[2]

As to the first element for Counts 2 and 4—whether the Hawaii Longshore Division was a "labor organization engaged in an industry affecting interstate or foreign commerce," the law and the requirements are the same as set forth above with respect to Counts 1 and 3.  Accordingly, if the Court finds that the Hawaii Longshore Division so qualified as to Counts 1 and 3, it should make the same finding as to Counts 2 and 4.

---

[2] This instruction was adopted from the Court's Instruction No. 15 in *United States v. Della Porta*, Cr. No. 08-942 PSG (C.D. Cal. April 1, 2009), *aff'd United States v. Della Porta*, 653 F.3d 1043 (9th Cir. 2011) and Court's Instruction No. 15, *United States v. Johnson*, Cr. No. 10-00190 GMN (D. Nev. April 4, 2012), *aff'd United States v. Johnson*, 529 F. Appx. 846 (9th Cir. 2013).

As to the second element of Counts 2 and 4—whether Mr. Brown was an officer of the Hawaii Longshore Division—the following legal provisions apply. The term "officer" means any constitutional officer, or any person who is authorized to perform the functions of president, vice president, **secretary, or treasurer** or other executive functions of a labor organization, or any member of the labor organization's executive board or similar governing body. *See* 29 U.S.C. § 402(n) (definition of officer).

As to the third element of Counts 2 and 4—whether Mr. Brown embezzled or converted to his own use the monies or funds of the Hawaii Longshore Division—the term "embezzle" and "convert to his own use" means to willfully take or otherwise convert to his own use or the use of another, the monies or funds rightfully belonging to the Hawaii Longshore Division.    That element is no different than what is prohibited by "common law theft crimes" or the theft of federal money prohibited by 18 U.S.C. § 641.[3] *See United States v. Thordarson*, 646 F.2d 1323, 1334-35 (9th Cir. 1981) (discussing elements of charges that the defendant stole union funds in violation of 29 U.S.C. § 501(c)).

---

3  The Ninth Circuit's Model Jury Instruction No. 8.39, sets forth the elements of theft of government property in violation of 18 U.S.C. § 641.  In its Comment, it cites to *United States v. Campbell*, 42 F.3d 1199, 1205 (9th Cir. 1994) (government must prove that defendant stole property with the intention of depriving the owner of the use or benefit of the property).

As to the fourth element of Counts 2 and 4—whether Mr. Brown acted unlawfully, willfully, and with the fraudulent intent to deprive the Hawaii Longshore Division of its monies or funds willfully in making the false entry or entries on the Wage Vouchers—the Government must prove that Mr. Brown acted with a fraudulent intent or a bad purpose or an evil motive.   *See United States v. Wiseman*, 274 F.3d 1235, 1240 (9th Cir. 2001).  "While the defendant must 'knowingly act wrongfully to deprive another of property,' there is no requirement that the defendant also know his conduct was illegal."  *Id.*

## V.   Proof of the Offenses

The proof of the offenses is set forth in the factual section above.  The only issue as to all four Counts appears to be whether Mr. Brown had the requisite fraudulent intent in submitting the false vouchers charged in Counts 1 and 3 and whether he fraudulently intended to steal money from the union as charged in Counts 2 and 4.  The Government does not believe there will be a dispute that the two Wage Vouchers contained overcharges that did not accurately reflect Mr. Brown's actual lost time wages and, as a result, the union paid sums to Mr. Brown to which he was not entitled.  The only real issue, the Government believes, will be whether Mr. Brown had the requisite fraudulent intent when he submitted the Wage Vouchers and then when he got paid for the overcharges by the union.

17

The Government anticipates proving Mr. Brown's fraudulent intent by emphasizing that the two false Wage Vouchers submitted in April 2014 were not isolated events; rather, they were merely the most recent thefts in a pattern of fraud and embezzlement which existed since the end of December 2009, when Mr. Brown first became Secretary-Treasurer of the union.  That is, for a period of four years and four months, Mr. Brown regularly stole money from the union, totaling approximately $100,000.

The Government has provided notice of its intent to adduce evidence relating to Mr. Brown's uncharged criminal conduct.  Dkt. 54.  Despite the fact that the Government timely filed such notice, the defense did *not* file a motion *in limine* to prohibit the Government from adducing such evidence.  Instead, the defense filed a memorandum in opposition to the Government's Notice.  *See* Dkt. 57.  In so doing, the defense did not follow the procedure prescribed by the Report of Final Pretrial Conference, Minutes and Order (Dkt. 53) ("Defendants shall oppose the use of such [404(b)] evidence by filing motions *in limine* as hereafter provided.").  Because the defendant failed to file a motion *in limine* seeking to bar the Government from using its evidence of uncharged criminal conduct, there is no motion or issue now before the Court and nothing for the Court to adjudicate at this time..  Nonetheless, the Government will reply to the defense's allegations and arguments in a Reply Memorandum, to be filed this Friday, March 25, 2022.

## VI.    <u>Other potential evidentiary issues</u>

The Government anticipates offering a number of business records from the union, from McCabe, and from Mr. Brown's credit union.  These records were all maintained in the ordinary course of business and should be admissible pursuant to Fed. R. Evid. 803(6).

The Government also intends to seek the admissibility of a number of tables, which summarize the overpayments made to Mr. Brown from December 2009 through April 2014.  Those tables, attached herewith as Trial Exhibits 25-32 are based on records that the defense has had in possession since April 2019.  The Government believes that the summary tables will be admissible pursuant to Fed. R. Evid. 1006.  While, at first glance, the tables appear to be complicated and perhaps confusing, the Government believes it can adequately explain them to the Court's satisfaction and they are crucial evidence to prove the four offenses.

DATED:  March 23, 2022, at Honolulu, Hawaii.

Respectfully submitted,

CLARE E. CONNORS
United States Attorney
District of Hawaii

By:  <u>*/s/ Marshall H. Silverberg*</u>
MARSHALL H. SILVERBERG
Assistant U.S. Attorney
NICOLE K. HUDSPETH
Special Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served on the following

counsel on the date and in the manner described below:

<u>Served Electronically through CM/ECF:</u>

WILLIAM HARRISON          WHARRISON@HAMLAW.NET
Attorney for Defendant
Charles Kimo Brown

DATED:  March 23, 2022, at Honolulu, Hawaii.


<u>/s/Shaunte Pompey</u>
Legal Assistant
U.S. Attorney's Office