CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

MARSHALL H. SILVERBERG #5111
Assistant U.S. Attorney
NICOLE K. HUDSPETH #11079
Special Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96580
Telephone: (808) 541-2850
Facsimile:  (808) 541-2958
E-mail:  Marshall.Silverberg@usdoj.gov
             Nicole.Hudspeth@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 19-00046 LEK |
| | ) | |
| Plaintiff, | ) | The Government's Offer of |
| | ) | Proof Regarding Evidence of the |
| vs. | ) | Defendant's Uncharged Criminal |
| | ) | Conduct; Certificate of Service |
| CHARLES KIMO BROWN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THE GOVERNMENT'S OFFER OF PROOF REGARDING
EVIDENCE OF THE DEFENDANT'S UNCHARGED
<u>CRIMINAL CONDUCT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Background ......................................................................................1

II.     The Government's Offer of Proof.....................................................9

        A.      Proof relating to the 27-days ...............................................9

        B.      Proof relating to the other days of overcharges ...............17

III.    Argument   .....................................................................................21

IV.     Conclusion   ..................................................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Case</u>                                                                                                   <u>Page(s)</u>

*United States v. Lague*,
  971 F.3d 1032 (9th Cir. 2020) ........................................................ 21, 22, 23, 24

<u>Statutes and Rules</u>

21 U.S.C. § 841 ........................................................................................ 21, 22, 23
Fed. R. Evid. 404 ..................................................................................... 21, 22, 23
Fed. R. Evid. 803 ........................................................................................... 5

On March 30, 2022, the Court filed its "Order Regarding the Admissibility of the Government's Proposed Evidence of Defendant's Uncharged Conduct" (Dkt. 63).   In that Order, the Court concluded that "the Government's proposed evidence of Brown's uncharged conduct is admissible at trial, provided that the Government makes a satisfactory offer of proof that it has sufficient evidence to establish that Brown engaged in the uncharged conduct." *Id.* at 9.  The Government hereby makes that offer of proof.

## I.   <u>Background</u>

As set forth in the Government's Trial Brief (Dkt. 58), during the relevant period of time—from December 21, 2009 through April 2014—the defendant had two jobs.

First, in a job that pre-dated December 21, 2009, the defendant was employed as a machine operator for McCabe Hamilton & Renny, Co., Ltd. ("McCabe"), Hawaii's oldest stevedore company.  In that job, the defendant drove vehicles on Hawaii's docks, helping to load and unload shipping vessels. McCabe's dock workers, like the defendant, were unionized.  Until sometime in 2009, that union was Local 142 of the International Longshore & Warehouse Union (ILWU).  On or before December 21, 2009, an autonomous division of Local 142 was created, called the Hawaii Longshore Division, Local 142, ILWU. It was to be governed by an Executive Board.

The Executive Board of the Longshore Division met for the first time on December 21-22, 2009.   The Minutes from the Executive Board of that meeting has been pre-marked as Government's Exhibit 1.[1]

The Minutes reflect that at the beginning of the meeting, the defendant took an Oath of Office and was installed as the Secretary-Treasurer of the Longshore Division.   *Id.* at 1.[2]   The Minutes further reflect that the newly-installed Executive Board, including the defendant, discussed proposed Bylaws to govern the Longshore Division and its members.   *Id.* at 2-6.   The Bylaws, attached to the Minutes as Attachment D, were read into the record by the Longshore Division Director, Nate Lum.[3]   *Id.* at 6.   Mr. Lum described the Bylaws as the Longshore Division's "bible."   *Id.* at 10.   The Bylaws were then adopted unanimously by the Executive Board.   *Id.*   The Bylaws, adopted at that Executive Board meeting held on December 21, 2009, is Government's Exhibit 2.[4]

---

[1] Government's Exhibit 1, and the Government's other trial exhibits, will be provided to the Court and the defendant's counsel under separate cover.  All references herein to "Exhibits" will be to those Government Trial Exhibits.

[2]  The Longshore Division's other officers also were sworn and installed.

[3] Nate Lum has been convicted in this Court of two crimes unrelated to this case.  See *United States v. Lum*, Cr. No. 18-00073 DKW (D. Haw.).

[4]  For the Court's convenience, the Government has detached the Bylaws (Attachment D to the Minutes of Dec. 21-22, 2009) and made it into a separate exhibit for the trial, Exhibit 2.  The Bylaws were amended on December 13, 2012, in ways not pertinent to this trial, with the amended Bylaws being Exhibit 7.

2

Article II of the Bylaws (Exhs. 2, 7) provides that the Division Director, Vice Division Director, and the Division Secretary-Treasurer were to be compensated for their union work with "lost-time pay," while the two business agents were to be paid salaries. The Government anticipates adducing evidence that the reason that the Executive Board adopted "lost-time pay" for the Division Director, Vice Division Directors, and Division Secretary-Treasurer was because it was anticipated that those positions would not be considered full-time employment and that, instead, those officers could continue to work, at least part-time, at their companies, like McCabe. However, when they did work for the Longshore Division doing union business, the officers would be compensated as if they had worked for their companies and would earn the same compensation they would have earned, only it would come from the Longshore Division instead of from the companies. In other words, the officers would not be financially penalized for doing their union work instead of their assigned company work.

For the defendant, as a machine operator for McCabe, it meant that when he worked for McCabe he would be paid like any other machine operator and in accordance with the Collective Bargaining Agreement ("CBA") (Exh. 16). That CBA was in effect from July 1, 2008 - June 30, 2014, covering the time period relevant to this case. The wage schedule that determined the wages for machine workers like the defendant is attached as Exhibit A to the CBA.

And so when the defendant worked for the Longshore Division, performing his duties as its Secretary-Treasurer, he was entitled to the "lost-time pay" that he would have earned had he worked on that day for McCabe.[5]  In order to be compensated for that "lost-time pay," the defendant prepared and signed Wage Vouchers, informing the accounting staff at Local 142, which handled the accounting duties for the Longshore Division, of how much "lost-time pay" the defendant claimed he was entitled to receive for a particular day, or week.

The chief of the accounting department for Local 142 was Matthew Arakawa and the Government intends to call him as a witness at the trial. According to Mr. Arakawa, the Wage Vouchers were signed by the defendant, and co-signed by Division Director Lum.  Mr. Arakawa is expected to testify that the Accounting Department for Local 142 could not, and did not, challenge any of the Wage Vouchers submitted by the defendant (or anyone else who was an officer of the Longshore Division).  Instead, the Accounting Department for Local 142 would prepare paystubs and issue checks to the defendant (and the other officers) based upon the "lost-time pay" he or they had claimed on their Wage Vouchers.

---

[5] This could mean, however, that the defendant might only work, say, one daytime hour for the Longshore Division but would be entitled to 10 hours of nighttime overtime pay that he could have earned that day had he worked for McCabe instead.  Of course, the reverse could also be true—that the defendant might work a longer day at the union than he would have worked at McCabe and be entitled only to the lesser McCabe hours and wages.

In response to a subpoena, the Accounting Department of Local 142 has produced all of the Wage Vouchers submitted by the defendant after he was sworn in as Secretary-Treasurer on December 21, 2009, through the end of April 2014. Together, they are Exhibit 9 and the Government anticipates seeking their admission into evidence via the testimony of Mr. Arakawa as business records maintained and relied upon by Local 142, pursuant to Fed. R. Evid. 803(6).

Because that exhibit will be bulky and difficult to manage at trial, the Government has carved out relevant subsets from that exhibit.

One subset is Exhibit 11, which contains the defendant's Wage Vouchers for 27 days in which he claimed "lost-time pay" from the Longshore Division, allegedly because he could have worked for McCabe on those days, when, in truth, he could not have worked for McCabe on those days.  The Government's theory at trial will be that this is the more egregious category of two categories of thefts committed by the defendant—that is, obtaining compensation from the Longshore Division in the amounts ranging from $262.50 to $600.00 for days when he could not have worked at all for McCabe and which were embezzlements from the Longshore Division on each of those days.  The last of those 27 days—occurring on April 15, 2014—is part of the offenses charged in Counts 3 and 4 of the Indictment.  All 27 days have been tabled on Exhibit 32 and will be the focus of the Government's presentation at trial.

The second category of thefts—that is, other than the 27 days when the defendant claimed via his Wage Vouchers that he was entitled to "lost-time" pay when he was not entitled to *any* pay at all—concern "overpayments" on days that the defendant was entitled to *some* "lost-time pay" but not as much as he claimed on his Wage Vouchers.  This category is different from the first category because, for example, the defendant may have, on a particular day, been entitled to 8 hours of "lost-time pay" but instead inflated on his Wage Voucher that he was entitled to 12 hours of "lost-time pay."

Another subset of Exhibit 9 is Exhibit 12, which is the defendant's Wage Voucher for the week of April 7, 2014, through April 11, 2014.  It is the basis for Counts 1 and 2 of the Indictment.

Another subset of Exhibit 9 is Exhibit 13, which is the defendant's Wage Voucher for the week of April 14, 2014, through April 18, 2014.  It is the basis for Counts 3 and 4 of the Indictment.

Exhibits 14 and 15 are the defendant's paystubs from the Longshore Division for the weeks of April 7, 2014, and April 14, 2014, respectively, proving that the defendant was paid the amounts of money he claimed on the Wage Vouchers submitted in Exhibits 12 and 13.  Exhibit 23 contains the relevant bank records, proving that the Longshore Division checks paid to the defendant for those two weeks in April were deposited into his joint (with his spouse) bank account.

6

The Government will then compare those Wage Vouchers (Exhibits 12 & 13) with business records maintained by McCabe, which reflect in detail how much "lost-time pay" the defendant was entitled to claim from the union. The Government will call Kevin Cutter who, during the relevant time period, was a dispatcher for McCabe. Today, Mr. Cutter is Vice President of Operations for McCabe and a custodian of its operational records. Mr. Cutter is expected to testify that the defendant would generally call the McCabe office during the weekends, and he, Mr. Cutter, would respond to the defendant's inquiry as to how many hours, and at what rate (whether it was "straight time" or "overtime") he was entitled to claim as "lost-time pay" from the Longshore Division.

Mr. Cutter is expected to testify that after the defendant called him, Mr. Cutter would consult with the McCabe "logbook" to determine how many hours, and at what rate, the defendant was entitled to "lost time pay." The logbook will be explained by Mr. Cutter and how it reflects the hours each machine operator worked during all the days in question. This includes the fact that for most of the 27 days discussed above, the logbook documents that no machine operator worked (or only one or a few machine operators worked who were not relevant to the defendant's entitlement to collect "lost-time pay"), meaning that the defendant was not entitled to *any* "lost time pay" on those 27 days. In a sense, much of the case is merely comparing the McCabe logbook to the defendant's Wage Vouchers.

7

The McCabe logbook for December 28, 2009, through May 11, 2014, has been marked as Exhibit 24.  The Government anticipates moving it into evidence as a business record.  Mr. Cutter is expected to testify that he examined each page, and then initialed and dated each page, after confirming that each page was an exact reproduction of the logbook for those days as maintained by McCabe.

But, as with the Wage Vouchers, Exhibit 24 is bulky and would likely be difficult too use effectively during the trial.  Consequently, the Government has carved out relevant subsets.  Exhibit 17 is the one page of the logbook for the four-week period of March 17, 2014 - April 13, 2014, covering the time period charged in Counts 1 and 2.  Similarly, Exhibit 18 is the one page of the logbook for the four-week period of April 14, 2014 - May 11, 2014, covering the time period charged in Counts 3 and 4.

However, even those single-page four-week time periods are somewhat confusing.  Consequently, the Government further carved out the two one-week periods charged in the Indictment.  Exhibit 19 is the McCabe logbook for the first week of April 7-13, 2014.  That covers the time period for the Wage Voucher the defendant submitted for the week of April 7-11, 2014 (Exhibit 12) and is the basis for Counts 1 and 2.  Exhibit 20, in turn, is the McCabe logbook for the second week of April 14-20, 2014.  That covers the time period for the Wage Voucher the defendant submitted for the week of April 14-18, 2014 (Exhibit 13).

## II.     **The Government's Offer of Proof**

The proof for the two types of uncharged criminal conduct will be similar.

### A. **Proof relating to the 27-days**

The Government respectfully draws the Court's attention to Counts 3 and 4 of the Indictment.  Count 3 charges that on or about April 18, 2014, the defendant submitted a false entry in a record, i.e., the Wage Voucher for the week of April 14-18, 2014 (i.e., Exhibit 13).  Count 4 alleges that on or about April 21, 2014, the defendant embezzled and converted to his own use funds belonging to the Longshore Division in the approximate amount of $1,181.25.

Here is how the Government is going to prove those two counts.

Exhibit 13 is the defendant's Wage Voucher for April 14-18, 2014.  It reflects that for Monday, April 14, 2014, the defendant claimed 14.5 overtime hours (the "straight time" (S.T.) rate was $37.50; the "overtime" (O.T.) rate was 1.5 times the straight time hourly rate, that is, an hourly rate of $56.25).

In contrast, Exhibit 20 is the relevant McCabe logbook page for the week of April 14, 2014.  It reflects that on April 14, 2014, the defendant was entitled to "UL," which Mr. Cutter will testify means "union leave," which he will further testify means the same thing as "lost-time" hours.  In other words, on April 14, 2014, the defendant could have worked on the docks for McCabe as a machine operator and earned overtime pay of 10 hours, at an hourly rate of $56.25.

9

However, instead of listing 10 hours of O.T. (overtime hours) on the Wage Voucher, the defendant listed 14.5 hours, giving himself an overcharge of 4.5 hours times the hourly rate of $56.25, for a total theft for that day of $253.12.

But it is the next day—April 15, 2014—which contains the most damning misstatement. On that date, according to the defendant's Wage Voucher (Exhibit 13), he claimed he was entitled to 10 hours of overtime for "lost-time pay" at an hourly rate of $56.25, for a total compensation of $562.50. And the Government will prove through the defendant's bank records and the defendant's pay stub that he actually was paid that amount of money for that day.

In contrast, logbook entry for April 15, 2014, set forth in Exhibit 20, indicates that the defendant was actually entitled to _no_ "lost-time pay" for April 15, 2014. The Government anticipates that the defense may be that the logbook entry was incorrect and that the defendant's Wage Voucher was correct. In order to determine the validity of such a defense, the Government obtained the pay stubs for all of the machine operators in the defendant's "gang" (the term the union and McCabe use to characterize the machine operators in the defendant's group) and they are part of Exhibit 35. These paystubs firmly prove that the logbook is correct—no machine operator in the defendant's gang worked for McCabe on April 15, 2014, and the defendant's Wage Voucher that included that day (Exhibit 13) is false. No other reasonable conclusion can be drawn from the records.

10

Nonetheless, the Government anticipates that the defense may argue that even if the Wage Voucher for April 15, 2014 (Exhibit 13), was false in claiming 10 overtime hours for "lost-time pay," that could be considered an inadvertent "mistake" by the defendant and not a knowing and intentional falsehood as charged in Counts 3 and 4. In other words, the defendant might acknowledge the falsehood on the Wage Voucher but deny he had the necessary scienter to make this a criminal offense. This is why the evidence of the other overcharges for the other 26 days is so important in this case.

The Government respectfully directs the Court's attention to the Table set forth as Exhibit 32. It summarizes the evidence proving that the defendant submitted 26 other Wage Vouchers which claimed that he was entitled to various amounts of "straight-time pay" or "overtime pay" on 18 days in which no one in his gang worked or, on 8 of those 26 days, one to three people worked, but which the defendant still was not entitled to "lost-time pay." The Government will first review the 18 days where no machine operator in the defendant's gang worked.

The Government respectfully directs the Court's attention Exhibit 39.  It consists of three documents. First, is the defendant's Wage Voucher for May 11, 2012. Matt Arakawa will testify that it reflects that for May 11, 2012, the defendant claimed he was entitled to 13.5 hours of straight time, at an hourly rate of $35.00, for a total compensation of $472.50.

11

The second document in Exhibit 39 is the McCabe logbook page which includes May 11, 2012.  Kevin Cutter will testify that it reflects that no one in the defendant's gang worked on that day, meaning the defendant was not entitled to any "lost-time pay" for that day.

The third document in Exhibit 39 is a compilation of all the pay stubs for the defendant's gang for the week that included May 11, 2012.  They will be authenticated and explained by McCabe's Chief Financial Officer, Kim H. Chock, who will testify that no machine worker in the defendant's gang was paid for any work on May 11, 2012.  In other words, the logbook page is correct—and the defendant was not entitled to any "lost-time pay" for May 11, 2012—and the defendant's Wage Voucher for that day, claiming that the defendant was entitled to 13.5 hours of straight-time pay is false.  The records for May 11, 2012, are clear and not open to any other reasonable interpretation.  The defendant's Wage Voucher for that day was false and the defendant was paid improperly paid $472.50 for non-existent work that he claimed that he was entitled to be paid.

The same three types of documents which are part of Exhibit 39 are included for the 17 other days in which the defendant claimed "lost-time pay" when in truth no one in his gang worked and the defendant did not "lose" *any* "time" for which he was entitled to be compensated by the Longshore Division.   The other 17 days are, with the Exhibit Numbers containing the three relevant documents for each,

12

the false numbers of hours claimed by the defendant for each day, and the

improper payments he received (summarized in the Table that is Exhibit 32) are:

| Date | Exhibit Number | Hours claimed | Improper payment |
|------|----------------|---------------|------------------|
| May 15, 2012 | 40 | 15 | $525.00 |
| August 7, 2012 | 42 | 7.5 | $271.88 |
| October 26, 2012 | 43 | 15 | $543.75 |
| December 18, 2012 | 44 | 16 | $580.00 |
| January 18, 2013 | 45 | 12 | $435.00 |
| March 12, 2013 | 46 | 15 | $543.75 |
| March 19, 2013 | 47 | 15 | $543.75 |
| April 9, 2013 | 49 | 15 | $543.75 |
| April 16, 2013 | 50 | 7.5 | $271.88 |
| May 7, 2013 | 51 | 15 | $543.75 |
| May 14, 2013 | 52 | 16 | $580.00 |
| August 6, 2013 | 53 | 7.5 | $271.88 |
| September 24, 2013 | 54 | 15 | $562.50 |
| October 29, 2013 | 55 | 10 | $562.50 |
| November 19, 2013 | 56 | 10 | $562.50 |
| February 11, 2014 | 58 | 11 | $600.00 |
| March 11, 2014 | 59 | 10 | $562.50 |

Testimony relating to all three types of documents will come from the same

three witnesses.   Mr. Arakawa will interpret the Wage Vouchers; Mr. Cutter will

interpret the logbook entries; and Ms. Chock will interpret the paystubs.

With respect to the other 8 days in which one or a few machine operators in

the defendant's gang worked for McCabe, Mr. Cutter will testify that to calculate

the defendant's "lost-time," i.e, the hours the defendant could have worked for

McCabe but did not because he was on "union leave," he would have determine

the hours worked by the machine operator who worked instead of the defendant.

13

That is, not all 14 machine operators in the defendant's gang worked every day at the same time and for the same number of hours. Instead, sometimes, McCabe needed less than the full gang of machine operators to work that week. McCabe knew how many ships were arriving during a particular week and accordingly what its work needs were for the coming week. Consequently, Mr. Cutter, or another dispatcher, would prepare a "line-up" for the coming week and post it so that the defendant and the other machine operators in his gang would know the order of preference for the coming week. If a particular machine operator was at the top of the line-up, that meant that he would be the first one called to work when a ship arrived. In contrast, if a particular machine operator was at the bottom of the line-up that meant that he would be the last to be called to work that week and indeed might not work at all that week. Thus, while undoubtedly the machine operators were well paid by the hour when they did work, there was no guarantee that they would work during a particular week.

Mr. Cutter is expected to testify that McCabe attempted to fairly spread out the work amongst all of the machine operators in the defendant's gang. The company did that by shuffling the line-up from week-to-week, depending upon how many hours each machine operator worked the prior week. So, for example, the person who worked most during the first week of a month because he was at the top of the line-up, would be moved to the bottom of the line-up the following

14

week so others would have a greater opportunity to work the second week.  The

goal, according to Mr. Cutter, was to fairly spread the work opportunities for all of

the machine operators in the defendant's gang so by the end of the year, they

would be roughly equal amongst all of them.

Importantly, in order to decide how many "lost-time" hours the defendant

was entitled to claim as "union leave," the dispatcher, usually Mr. Cutter, would

have to consult with the machine operator who was below the defendant on the

line-up who had worked because the defendant had turned down the opportunity of

work on the docks to instead work for the Longshore Division.  Those hours would

then be reflected in the defendant's box on the logbook.  The defendant's "bango"

number was 1088.  Thus, for example, Exhibit 20 reflects that the defendant, as

bango number 1088, was eligible for 10 hours of "union leave" for April 14, 2014,

because the person below him on the line-up worked 10 hours (at the overtime

rate) instead of the defendant working those 10 hours.

Now, the Government returns to the 8 days where *someone* in the

defendant's gang worked but the majority of the machine operators in that gang did

not work.  Exhibit 32 reflects that on November 29, 2011, Alvis Satele (bango

number 1068) and William Cambra (bango number 1118) each worked 3 hours of

straight time and 2 hours of overtime.  And, according to the logbook page and

paystubs which are part of Exhibit 37, Mr. Satele and Mr. Cambra were the only

machine operators in the defendant's gang to work that day.  Thus, if either Mr. Satele or Mr. Cambra was the machine operator directly below the defendant for the week which included November 29, 2011, the defendant would be entitled to "lost-time" hours for the hours worked by Mr. Satele or Mr. Cambra (i.e., 3 hours of straight time and 2 hours of overtime).  The issue, therefore, is whether Mr. Satele or Mr. Cambra was the machine operator directly below the defendant on the line-up for the week including November 29, 2011.

In order to make that determination, the Government requested Mr. Cutter to go to the logbook and recreate the line-up for the week of November 29, 2011. The line-up for that week and the other 7 days are part of Exhibit 21.  Mr. Cutter is expected to testify that the machine operator directly below the defendant for the week including November 29, 2011, was *not* Mr. Satele or Mr. Cambra (instead it was Michael Beazley), meaning that the defendant was not entitled to claim any of the five hours Mr. Satele and Mr. Cambra worked as his own "lost-time" hours. Thus, the defendant was entitled to no "lost-time pay" for November 29, 2011.

Likewise, for 6 of the other 7 days (one day was a tie) in which one or as many as three machine operators in the defendant's gang worked, the Government asked Mr. Cutter to recreate the line-ups for the weeks including those 7 days.  In each instance, the machine operator(s) who worked those days were not the ones listed below the defendant on the line-ups for the weeks that included those days.

16

Consequently, the defendant was *not* eligible to receive the "lost-time" hours for those days because he was not eligible to work instead of those machine operators who did work on those days. In other words, those other machine operators were above the defendant on the line-ups for those weeks. The persons who were directly below the defendant on the line-ups for those weeks are identified in the column to the far right on Exhibit 32 and that is the information the Government received from Mr. Cutter.

In sum, the Government believes that the evidence establishes beyond a reasonable doubt that the defendant submitted false Wage Vouchers on 26 days not charged in the indictment (with the 27th day, April 15, 2014, being charged as part of Counts 3 and 4) resulting in him embezzling more than $12,000 from the Longshore Division. Those 26 false Wage Vouchers will be critical evidence for the Government to prove that the defendant knowingly and intentionally submitted the false Wage Voucher charged in Count 3 in order to receive the embezzled funds he received from the Longshore Division which are charged in Count 4.

## B.    Proof relating to the other days of overcharges

The evidence regarding the other days of overcharges—that is, days other than the 27 days discussed above—were determined by comparing the defendant's Wage Vouchers (Exhibit 9) with the McCabe logbook (Exhibit 24) for the entire period that the defendant was the Secretary-Treasurer for the Longshore Division,

that is, from December 21, 2009, through the end of April 2014.[6]  The results were compiled and interpreted by U.S. Department of Labor Supervisory Investigator Pearl Moenahele, with the assistance of IRS Special Agent Shaun Morita, and are summarized below.  Ms. Moenahele will testify about the methodology they used in preparing the tables described below and the data contained therein.  A summary of a portion of her testimony is as follows:

**Trial Exh. 25**:  This is a listing of all of the Wage Voucher entries Mr. Brown submitted in ***December 2009*** (after being sworn in as Secretary-Treasurer of the union on December 21, 2009), with the alleged overcharges highlighted in yellow.  The total number of Wage Voucher entries with alleged overcharged hours is 3; the total number of overcharged hours is 11; and the total amount of money the defendant allegedly stole from the union in December 2009 is $374.00.

**Trial Exh. 26**: A listing of all of the Wage Voucher entries Mr. Brown submitted in ***2010***, with the alleged overcharges highlighted in yellow.  The total number of Wage Voucher entries with overcharged hours is 40 (38 percent of the total); the total number of allegedly overcharged hours is 252.73; and the total amount of money he allegedly stole from the union in 2010 is $8,711.04.

---

[6]  The defendant resigned his position as Secretary-Treasurer of the Longshore Division by letter dated June 2, 2014 (Exhibit 8).  As far as the Government is aware, he did not submit any Wage Vouchers for May 2014 and that is why that month was not analyzed by the Government.

**Trial Exh. 27**: A listing of all of the Wage Voucher entries Mr. Brown submitted in **_2011_**, with the alleged overcharges highlighted in yellow.  The total number of Wage Voucher entries with overcharged hours is 50 (31 percent of the total); the total number of allegedly overcharged hours is 368; and the total amount of money he allegedly stole from the union in 2011 is $12,833.25.

**Trial Exh. 28**: A listing of all of the Wage Voucher entries Mr. Brown submitted in **_2012_**, with the alleged overcharges highlighted in yellow.  The total number of Wage Voucher entries with overcharged hours is 115 (48 percent of the total); the total number of allegedly overcharged hours is 808.99; and the total amount of money he allegedly stole from the union in 2012 is $28,962.52.

**Trial Exh. 29**: A listing of all of the Wage Voucher entries Mr. Brown submitted in **_2013_**, with the alleged overcharges highlighted in yellow.  The total number of Wage Voucher entries with overcharged hours is 134 (57 percent of the total); the total number of allegedly overcharged hours is 963.02; and the total amount of money he allegedly stole from the union in 2013 is $35,326.19.

**Trial Exh. 30**: A listing of all of the Wage Voucher entries Mr. Brown submitted in **_2014_**, with the alleged overcharges highlighted in yellow.  The total number of Wage Voucher entries with alleged overcharged hours is 42 (56 percent of the total); the total number of overcharged hours is 271.66; and the total amount of money he allegedly stole from the union in 2014 is $10,187.16.

19

**Trial Exh. 31**: A summary of the tables set forth in Exhibits 25-30: the total number of Wage Voucher entries Mr. Brown submitted from Dec. 2009-April 2014 (818); the total of the Wage Vouchers which contained overcharges (384) and undercharges (71); the total of overcharged hours (2,679.4); and the total amount of money Mr. Brown allegedly stole from the union ($96,394.16).

What all of this means is that for a significant period of time, from December 2009 until April 2014, on a consistent basis, the defendant overcharged the Longshore Division for his "lost-time pay." The way the system was created, it was an "honor" system which required the defendant (and the other officers of the Longshore Division) to honestly inform the Accounting Department of Local 142 of their "lost-time pay." Instead, the defendant, on a consistent basis, inflated his "lost-time" hours, resulting in a pattern of overpayments to him, and embezzlements from the Longshore Division, which total approximately $100,000. The defendant did not suddenly decide, in April 2014, to steal from the Longshore Division; rather, he had been doing it on a consistent basis since the end of 2009.

In sum, the Government will prove, via the Wage Vouchers, the McCabe logbook, the Tables which are Exhibits 25-31, and the testimony of Supervisory Inspector Moenahele, that the defendant knew full well what he was doing in April 2014 when he submitted the two wage vouchers containing the false entries. It was part of a practice and plan that he had been doing for more than 4 years.

### III.   __Argument__

In *United States v. Lague*, 971 F.3d 1032, 1038 (9th Cir. 2020), the

defendant, a former physician's assistant, was convicted of 39 counts of

distributing controlled substances outside the usual course of professional practice

and without a legitimate medical purpose to five of his former patients, in violation

of 21 U.S.C. §§ 841(a)(1), (b)(1)(c), and (b)(2).  *Id.* at 1035.

In addition to the evidence relating directly to the five patients, the

Government introduced the defendant's practice-wide prescription data from 2015

and 2016 to show his prescription levels compared to that of other opioid

prescribers.  *Id.* at 1036.  The data concerned the defendant's prescriptions for 458

patients unrelated to the Second Superseding Indictment.  *Id.*  "The prescription

data showed that Lague had prescribed opioids at among the highest rates

compared to other pain management prescribers in California."  *Id.*

On appeal, the issue before the Ninth Circuit was whether the district court

erred under Fed. R. Evid. 404(b), by allowing the Government to present data of

his practice-wide prescriptions.  *Id.* at 1037.  Lague argued that the uncharged

prescriptions did not support an inference that he intended to write the charged

prescriptions outside the usual course of professional practice and without a

legitimate medical purpose.  *Id.* at 1037-38.

The Ninth Circuit set forth the relevant four-part test and noted that the "material issue" was "whether Lague intended to prescribe controlled substances to the five patients covered by the Second Superseding Indictment without a legitimate medical purpose." *Id.* at 1038.  "If Lague's aberrational prescription data is probative of his intent to prescribe the underlying, uncharged prescriptions without a legitimate medical purpose, there is a logical connection between the 'other' prescriptions and the charged prescriptions." *Id.*

The Ninth Circuit then noted it had not yet decided whether a medical professional's practice-wide prescription data would be probative of his unlawful intent in a prosecution brought under 21 U.S.C. § 841.  Consequently, it examined competing cases on this issue from the Eleventh Circuit and the Eighth Circuit.

In reaching its decision, the Ninth Circuit stated the following principles:

> ***Rule 404(b) is a rule of inclusion—not exclusion***—which references at least three categories of other 'acts' encompassing the inner workings of the mind: ***motive, intent, and knowledge.***  **Under our 'low threshold test of sufficien[cy],' the government 'need not prove Rule 404(b) evidence by a preponderance of the evidence[.] Instead, the government need only lay a factual foundation from which a 'jury could reasonably conclude that [the defendant] committed the allegedly-similar bad acts,' and that he possessed the requisite intent in committing those bad acts**.  In deciding where 'other act' evidence is relevant to prove intent, we defer to the 'district judge's own experience, general knowledge, and understanding of human conduct and motivation.'

*Lague*, 971 F.3d at 1040 (emphasis added) (citations omitted)).

The court then held:

> ***Applying this relaxed standard***, we hold that uncharged prescriptions of controlled substances in enormous quantities, and in dangerous combinations, support a reasonable inference that the underlying prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose. ***Lague's practice-wide evidence was therefore probative of his unlawful intent, undermining his defense at trial that the charged prescriptions amounted to 'a few bad judgments.'*** Because the prescription data made the intent element of the section 841 charges more probable, the district court properly admitted Lague's uncharged prescriptions under Rule 404(b).

*Id.* (emphasis added).

Applying the "relaxed standard" established by the Ninth Circuit in *Lague,* there should be no reasonable doubt that all of the Government's proffered evidence of the defendant's uncharged criminal conduct should be admissible in this case. Indeed, the Government believes that the evidence proves beyond a reasonable doubt that the defendant committed the uncharged criminal acts and that the trier of fact would have found the defendant guilty of those other acts if they had not been barred by the statute of limitations and, instead, had been charged in separate counts of the Indictment. Accordingly, the evidence is well beyond the "relaxed standard" established in *Lague.* For that reason, the Government respectfully requests that all of the evidence of uncharged criminal conduct described hereinabove be deemed admissible by the Court.

23

IV.   **Conclusion**

The Government has presented a detailed offer of proof, which goes well beyond the "relaxed standard" established by the Ninth Circuit in *Lague*.  For that reason, the Government respectfully requests that it be permitted to adduce that evidence during the trial.  It will then be up to the Court, as the trier of fact, to determine the weight to be given to such evidence in rendering its verdict.

Dated: April 1, 2022, at Honolulu, Hawaii.

Respectfully submitted,

CLARE E. CONNORS
United States Attorney
District of Hawaii

By */s/ Marshall H. Silverberg*
  MARSHALL H. SILVERBERG
  Assistant U.S. Attorney
  NICOLE K. HUDSPETH
  Special Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that, on the date and by the methods of service noted below, a true and correct copy of the foregoing document was served electronically through CM/ECF:

William Harrison
wharrison@hamlaw.net


Attorney for Defendant
CHARLES KIMO BROWN

DATED: April 1, 2022, Honolulu, Hawaii.

/s/ Rowena Kang
_____
U.S. Attorney's Office
District of Hawaii