CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

MARSHALL H. SILVERBERG #5111
Assistant U.S. Attorney
NICOLE K. HUDSPETH #11079
Special Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96580
Telephone: (808) 541-2850
Facsimile:  (808) 541-2958
E-mail:  Marshall.Silverberg@usdoj.gov
             Nicole.Hudspeth@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 19-00046 LEK |
| | ) | |
| Plaintiff, | ) | The Government's Closing |
| | ) | Argument; Table of Contents; |
| vs. | ) | Trial Exhibits 12, 13, 19, 20, 22, |
| | ) | 32, 61, 70, and 71; Certificate of |
| CHARLES KIMO BROWN, | ) | Service |
| | ) | |
| Defendant. | ) | |
| | ) | |

## THE GOVERNMENT'S CLOSING ARGUMENT

## **TABLE OF CONTENTS**

**Page**

I.   Introduction ................................................. 1

II.  The Elements of the Offenses Charged in Counts 1 and 3 ........................... 1

   1)   The Longshore Division of the ILWU, Local 142, was a "labor
        organization" required to file annual reports (LM-2s) with
        the Secretary of Labor and to keep records on matters
        required to be reported in the annual reports ....................................... 2

   2)   The defendant's wage vouchers were records required to be kept
        by the Hawaii Longshore Division under 29 U.S.C. § 436 ................. 2

   3)   The defendant's wage vouchers for the weeks of April 7, 2014
        (Exh. 12) and April 14, 2014 (Exh. 13) contained false entries ......... 3

   4)   The defendant acted willfully in making the false entries
        on the two wage vouchers (Exhibits 12 and 13) ................................ 19

III. The Elements of the Offenses Charged in Counts 2 and 4 ........................... 23

   1)   The Longshore Division of the ILWU, Local 142, was a
        "labor organization engaged in an industry affecting
        interstate or foreign commerce" ......................................................... 23

   2)   Mr. Brown was an officer of the Hawaii Longshore Division .......... 24

   3)   On April 14, 2014 (with respect to Count 2) and on April 21, 2014
        (with respect to Count 4), Mr. Brown knowingly embezzled and
        converted to his own use monies of the Longshore Division ........... 24

   4)   Mr. Brown acted unlawfully, willfully and with the fraudulent
        intent to deprive the Hawaii Longshore Division of its funds ........... 24

## I.   **Introduction**

In accordance with the Order filed on April 7, 2022 (Dkt. 70), and Fed. R. Crim. P. 29.1(a), the Government hereby submits its Closing Argument.  This Closing Argument assumes that the elements of the offenses, set forth in the Government's Trial Brief (Dkt. 58), which were not challenged by the defense before or during the trial, are the applicable legal standards.[1]

## II.   **The Elements of the Offenses Charged in Counts 1 and 3**

As stated in the Government's Trial Brief (Dkt. 58), the elements of Counts 1 and 3 of the Indictment, which charge violations of 29 U.S.C. § 439(c), are:

1) First, that the Longshore Division of the ILWU, Local 142, was a "labor organization" required to file annual reports (LM-2s) with the Secretary of Labor and to keep records on matters required to be reported in the annual reports;

2) Second, Wage Vouchers were records required to be kept by the Longshore Division under 29 U.S.C. § 436;

3) Third, that on or about the dates charged in Counts 1 and 3 in the Indictment, Mr. Brown made or caused another to make a false entry in the Wage Vouchers; and

4) Fourth, Mr. Brown acted willfully in making the false entry or entries on the Wage Vouchers.

Government's Trial Brief (Dkt. 58) at 10.

The Government will now address those four elements in seriatim.

---

[1] Fed. R. Crim. P. 30(d) requires that any objections to jury instructions be made before the jury retires to deliberate.  Although this case proceeded via a bench trial and not a jury trial, the underlying principle should apply here as well.

1) **The Longshore Division of the ILWU, Local 142, was a "labor organization" required to file annual reports (LM-2s) with the Secretary of Labor and to keep records on matters required to be reported in the annual reports.**

Multiple witnesses testified that the Longshore Division of the ILWU, Local 142, was a "labor organization" required to file annual reports (LM-2s) with the Secretary of Labor and to keep records on matters required to be reported in the annual reports.[2]  See Tr.1 at 9-10 (test. of Matt Arakawa); Tr. 1 at 78 (test. of Lynette Martin); Tr. 2. at 9-11 (test. of Pearl Moenahele).  In addition, the LM-2s for the Longshore Division that it filed with the Secretary of Labor for the years 2010-2015 were received in evidence as Exhibit 33.  Accordingly, the Government has proven the first element of Counts 1 and 3 of the Indictment.

2) **The defendant's wage vouchers were records required to be kept by the Hawaii Longshore Division under 29 U.S.C. § 436.**

Multiple witnesses testified that the defendant's wage vouchers were records required to be kept by the Longshore Division.  Tr. 1 at 33 (test. of Mr. Arakawa); Tr. 2 at 11 (test. of Ms. Moenehale).  Also, 29 U.S.C. § 436 identifies "vouchers" as a type of record which labor organizations are required by law to retain. Accordingly, the Government has proven the second element of Counts 1 and 3.

---

2 There were three trial days and transcripts for each day have been prepared.  Tr. 1 refers to the transcript of the first trial day, April 5, 2022 (Dkt. 71); Tr. 2 refers to the transcript of the second trial day, April 6, 2022 (Dkt. 72); Tr. 3 refers to the transcript of the third trial day, April 7, 2022 (Dkt. 73).

### 3)  The defendant's wage vouchers for the weeks of April 7, 2014 (Exh. 12) and April 14, 2014 (Exh. 13) contained false entries.

The first real issue raised by the defense appears to be whether the defendant's wage voucher for the week of April 7, 2014 (Exh. 12) and/or the week of April 14, 2014 (Exh. 13) contained false entries.  In Mr. Harrison's Opening Statement, he stated the evidence at trial would establish that the entries in Exhibits 12 and 13 were not false; rather, he stated that the Government did not understand or take into account, either in the grand jury or since, the effect of overtime pay and how the defendant incorporated his overtime pay into the hours stated on his wage vouchers.  Tr. 1 at 6-8 (Opening Stmt. of Mr. Harrison).  Mr. Harrison's Opening Statement, however, was contrary to the evidence adduced at the trial.

Preliminarily, it should be noted that the wage vouchers at issue in this case, including but not limited to, Exhibits 12 and 13, were submitted by the defendant as "lost time" wages.  That is, the defendant was not paid a salary by the Longshore Division for his union work.  Instead, on days where the defendant *could have worked* for McCabe, Hamilton & Renny, Co., Ltd. ("McCabe") as a machine operator but chose instead to work for the Longshore Division, the union paid the defendant the "lost time" wages that he could have earned at McCabe.

The "lost time" wage system was an "honor system," which depended upon the honesty of union members—like the defendant—who sought payment from the Longshore Division for hours that they *could have* worked at McCabe (and other

3

companies) even though they did not actually do so.   As Mr. Arakawa testified:

> Q.  But in terms of the wage vouchers that we've been looking at, Exhibit 9
> and the other ones, were you in the position to question whether or not the
> information on the wage vouchers was accurate?
>
> A.  No.
>
> **Q.  You had a – would you call it an honor system?  Is that what it is?**
>
> **A.  Yes.**
>
> **Q.  Was there any way that anyone in your department could somehow
> call up the defendant's employer and ask whether he was entitled to
> those lost time wages?**
>
> **A.  No.**

Tr. 1 at 50 (test. of Mr. Arakawa) (emphasis added)).

The final preliminary matter is that it is indisputable, as the defendant

himself testified, that *he* was the person who prepared his wage vouchers,

including the two wage vouchers charged in the Indictment in Count 1 (Exh. 12)

and Count 3 (Exh. 13).  See Tr. 3 at 93-94, 111 (test. of Charles Brown); *see also*

Tr. 1 at 37-39 (test. of Mr. Arakawa); Tr. 1 at 80-83 (test. of Ms. Martin).

Thus, while there should be no doubt that the defendant prepared the wage

vouchers that are Exhibits 12 and 13, the question remains whether they contained

false entries resulting in him receiving greater payments from the Longshore

Division than he was legally entitled.  To answer that question, the Government

called Kevin Yutaka Cutter and Kim Hudson Chock to testify during the trial.

Kevin Cutter testified that he presently is the Vice President of Operations for McCabe. Tr. 1 at 97 (test. of Mr. Cutter). During the time period covered by the Indictment—from December 2009 through April 2014—Mr. Cutter was a dispatcher for McCabe. *Id.* As a dispatcher for McCabe, Mr. Cutter (and the few other dispatchers) scheduled the work force, tracked the work force, and turned in timesheets for the workers to be paid. *Id.*

Mr. Cutter described the duties of a machine operator who worked for McCabe. *Id.* at 100-01. This included driving tractor trucks that have containers. *Id.* at 101. Mr. Cutter then identified the defendant, Charles Kimo Brown, as a McCabe employee who worked as a machine operator. *Id.* at 100-05.

Mr. Cutter testified that the first page of Exhibit 24 was the logbook for the McCabe machine operators, like the defendant, who worked during the four-week period spanning from December 28, 2009, through January 24, 2010. *Id.* Mr. Cutter examined the first page of Exhibit 24 and made certain it was identical with the same page in the computer maintained by McCabe. *Id.* at 102-03. He did so for each one of the pages that was Exhibit 24 and then he initialed each page. *Id.* at 103. Exhibit 24 was then received in evidence. *Id.*

Mr. Cutter explained the information contained on the first day on the first page of Exhibit 24, which was for December 28, 2009. *Id.* at 104. The defendant had the "bango" number of 1088 and for December 28, 2009, the logbook

5

indicated that he was entitled to "UL" or "union leave." *Id.* Mr. Cutter testified

about what "union leave" means to him:

> Q. . . . [W]hat's the significance of union leave to you?
>
> **A. [By Mr. Cutter]: When someone takes union leave, they are eligible to get compensated what they would have worked that day, *so we track what that person would have worked*.**
>
> **Q. Okay. Get compensated by the union instead of by McCabe?**
>
> A. Yes.
>
> Q. Okay. And this would be the union that Mr. Brown was an officer for?
>
> A. Yes.

*Id.* at 105.

Mr. Cutter was shown Exhibit 17, which, he testified, was the page of the

logbook which included the week of Monday, April 7, 2014, through Sunday,

April 13, 2014. *Id.* at 106. The sheet reflected two shifts of machine operators,

with one shift working during the day and the other at night. *Id.* at 107. Every two

weeks the shifts switched, and that is reflected in the different colors used in the

logbook. *Id.* at 107-08. Mr. Cutter was shown Exhibit 18, which, he testified, was

the one-page of the logbook which included the week of April 14-20, 2014. *Id.* at

108-09. Mr. Cutter was shown Exhibit 19 (which was an enlargement of part of

Exhibit 17), which covered the week of April 7-13, 2014. *Id.* at 109.

6

Mr. Cutter was asked about the logbook entries for April 7, 2014:

Q.  So what I want to do is take you to April 7th.  So these logbook entries, when are they made?  Are they made contemporaneously that day?  The following day?  The week after?  How's that work?

A.  [By Mr. Cutter]:  We log on the day after the shift.

Q.  Okay.  Does it reflect hours that someone's supposed to work or hours that they actually work?

A.  Both, actually.

Q.  Okay.  Explain that.

A.  Well, we get a timesheet for whatever operation it is.  We derive the hours worked from that and log it for the people who have worked.  But for someone like Kimo [i.e., the defendant, Charles Kimo Brown] who took leave, that's the hours that he was supposed to have worked.

Q.  Okay.  So let's – explain what 1088 reflects.  What information is on there to you?

A.  1088 had union leave on the 7th and was supposed to work night shift for nine hours of overtime.

**Q.  Okay.  So wouldn't he be entitled to nine hours of overtime as lost time?**

**A.  Yes.**

Q.  So how would you know whether or not he was entitled to penalty time, for example?  Would you know that by looking at this?

A.  No.  We just log straight [and] overtime.

Q.  Okay.  And all these numbers point to you that these numbers are accurate?

A.  Yes.

7

**Q.  How is it that these numbers in the logbook become important to McCabe and to the union?  How are they used that affects people's livelihood?**

**A.  *They need to be accurate 'cause every Sunday we create a lineup using these hours from low to high.***

Q.  And does a lineup indicate who's supposed to work the next week?

A.  It – the lineup is the order that they are scheduled.

Q.  So does the order change from week to week?

A.  It should, yeah.

Q.  Okay.  And what's the goal there in changing up the order?

A.  To equally distribute the hours.

Q.  Okay.  So if a ship needed less than all these machine operators, it would be important where in the lineup you were in terms of whether you got to work that day; is that a fair statement?
A.  Yes.

**Q.  Okay.  And like – and you said you're trying to even it out so during the course of the year everyone's given the same number of hours?**

**A.  Yes.**

Q.  Because they're paid by the hour, they're not paid salaries, right?

A.  By the hour.

*Id.* at 109-112 (emphasis added).

Mr. Cutter testified about why the defendant was entitled to claim 9 hours of overtime "lost time" wages for April 7, 2014:

Q.  The number 9 came from somewhere, right?

8

A. In the logbook?

Q. In the logbook on Exhibit 19[?].

A. Yeah.   So that lineup that we spoke of earlier, I look at whoever the next guy was after Kimo in the lineup and that's where Kimo would have been. So that would translate into his lost time for the day.

Q. Okay. **And did anyone who worked on that shift work more than 9 hours?**

**A. No.**

Q. Okay.  But you can't tell from looking at Exhibit 19 whether there's any penalty time; is that right?

A. No.

Tr. 1 at 115-16.

Mr. Cutter testified about the following week, as indicated in Exhibit 20,

which ran from Monday, April 14, 2014, through Sunday, April 20, 2014:

Q. And looking at Exhibit 20, Mr. Brown is at the top for April 14th, and it indicates 10 hours that he could have worked but didn't work; is that right?

A. Yes.

**Q. Okay.  And then what about April 15th?   What does that show?**

**A. It shows an equal sign which notates that they were scheduled off?**

**Q. It was an off day, right?**

**A. Yes.**

**Q. So did anybody work on that day?**

**A. No.**

9

**Q.  Is there any possibility that anyone could have earned overtime for that day?**

**A.  No.**

**Q.  Okay.  Is there any possibility anyone could have earned penalty overtime?**

**A.  No.**

**Q.  Or double penalty overtime?**

**A.  Nope.**

Q.  If was an off day; is that right?

A.  Yes.

Tr. 1 at 116-17 (test. of Mr. Cutter) (emphasis added)).

Mr. Cutter testified that the defendant was entitled to claim 10 hours of "lost time" wages for April 16, 2014, *id.* at 117, lines 5-7; and 5 hours of overtime "lost time" wages for April 18, 2014.  *Id.* at 117, lines 24-25.

In sum, according to the logbook and Mr. Cutter's testimony, the defendant was entitled to claim, as "lost-time" wages, the following hours:

Monday, April 7, 2014 – 9 overtime hours

Monday, April 14, 2014 – 10 overtime hours

Tuesday, April 15, 2014 – Zero hours

Wednesday, April 16, 2014 – 9 overtime hours and 1 hour of penalty OT

Friday, April 18, 2014 – 5 overtime hours and 1 hour of straight time.

In comparison, according to the defendant's wage vouchers (Exhs. 12 and 13), he claimed the following "lost time" wages:

Monday, April 7, 2014 – 14.5 overtime hours (an extra 5.5 overtime hours)

Monday, April 14, 2014 – 14.5 overtime hours (an extra 4.5 overtime hours)

Tuesday, April 15, 2014 – 10 overtime hours (an extra 10 overtime hours)

Wednesday, April 16, 2014 – 11.5 overtime hours (an extra 1 hour of OT)

Friday, April 18, 2014 – 10 overtime hours (an extra 4.3 overtime hours).

As previously noted, in his Opening Statement, Mr. Harrison stated that the difference between the defendant's "lost time" hours in the McCabe logbook (Exhs. 19 and 20) and the "lost time" hours the defendant claimed on his wage vouchers (Exhs. 12 and 13), was attributable to the defendant earning penalty overtime and/or double penalty overtime.  To address that claim, the Government called Kim Hudson Chock, the Chief Financial Officer for McCabe.   Tr. 1 at 192.

Ms. Chock testified that Exhibit 34 contained the pay stubs for machine operators who worked from April 7-13, 2014.  *Id.* at 193-94.   These pay stubs would reflect if any of the machine operators who worked that week received penalty overtime or double penalty overtime.  *Id.* at 195.  She further testified that the employees' bango numbers were on the top left corner of the pay stubs.  *Id.* She also stated that the first number 1 of the bango number on the pay stubs just indicated the location of the employee's home port and it was the rest of the

number on the pay stubs that was the employee's actual bango number. *Id.* For example, the employee who had 11102 on his pay stub, really had the bango number of 1102 and that employee was Joseph Kamai. *Id.*

Whether or not Mr. Kamai received any overtime for April 7, 2014, was critically important in this case. According to Mr. Cutter's testimony, for the week beginning Monday, April 7, 2014, Mr. Kamai was the machine operator immediately below the defendant on the "line-up" and, consequently, the hours that Mr. Kamai's actually worked would have determined the defendant's "lost time" hours. Tr. 1 at 118-20 (test. of Mr. Cutter). Stated another way, if Mr. Kamai did not receive any penalty time or double penalty time for working on April 7, 2014, the defendant likewise was not entitled to receive any penalty time or double penalty time for that day *because his "lost time" hours/pay were determined by what Mr. Kamai actually received*, because Mr. Kamai was the person next in line below the defendant on the lineup for the week of April 7, 2014. *Id.*

Ms. Chock then testified that according to his pay stub, Joseph Kamai worked on April 7th, April 8th, April 10th, and April 13th. *Id.* Tr. 1 at 196 (test. of Ms. Chock). And for April 7, 2014, he worked 9 overtime hours (at the overtime rate of $56.25 per hour). *Id.*

Importantly, Ms. Chock further testified:

**Q.  If [Mr. Kamai] had worked any overtime, any penalty overtime hours, would that be reflected in that column that says POT?**

**A.  Yes.**

**Q.  *Okay.  So did Mr. Kamai earn any penalty or double penalty overtime for any time during that week?***

**A.  *No.***

Q.  Okay.  And he worked which days that week?

A.  April 7th, April 8th, April 10th, and April 13th.

*Id.* at 196 (test. of Ms. Chock) (emphasis added)).

Ms. Chock's testimony, based upon Exhibit 34, which was Mr. Kamai's pay stub from McCabe for the week of April 7, 2014, when combined with Mr. Cutter's testimony that the defendant was only entitled to the same "lost time" pay that Mr. Kamai actually received, *is proof beyond a reasonable doubt that the defendant was not entitled to claim 14.5 overtime hours for work performed on April 7, 2014, as indicated on his wage voucher* (Exh. 12).

The defendant attempted to circumvent that indisputable conclusion by testifying that the 14.5 hours on his wage voucher for April 7, 2014 (Exh. 12) reflected "lost time" hours from *Sunday, April 6, 2014*, that he had carried over to the next day, April 7, 2014.   He testified emphatically that he had worked Sunday, April 6, 2014, until 2300 hours and that he took off the remainder of the shift as "rest" time in accordance with the CBA.  Tr. 3 at 58-59 (test. of Mr. Brown).

13

And with respect to the alleged false entry for April 14, 2014, the defendant was even more dogmatic that he properly accounted for "lost time" on his wage voucher because he had worked on Sunday, April 13, 2014, and then he merely added that "lost time" to his claim for Monday, April 14, 2014:

> **A.  I took the 4.5 hours of overtime for Sunday, and I added it in on Monday to my voucher.  I got scheduled for 10 hours on Monday, which I put down, and the 4.5 differential is for Sunday night.**

Tr. 3 at 65 (test. of Mr. Brown) (emphasis added).

The defendant then had the temerity to claim that he was actually "*underpaid*" by the union because he should have been compensated even more for working on Sunday, April 6, 2014, and Sunday, April 13, 2014, than the 5.5 hours he added to his wage voucher for April 7, 2014, and the 4.5 hours he added to his wage voucher for Monday, April 14, 2014:

> **A.  . . . I'm looking at the log now and I was entitled to more work on those two Sundays going into Monday being on union leave.**
>
> **Q.  Okay.**
>
> **A.  *So I was actually shorted pay for those two Sundays.***

Tr. 3 at 66 (emphasis added).

With respect to the other three days during the week of April 14, 2014, which the Government alleges the defendant made false entries on his wage voucher (Exh. 13)—i.e., April 15, 2014 (when the defendant claimed 10 overtime hours while being entitled to claim zero hours); April 16, 2014 (when the

defendant claimed 11.5 overtime hours while being entitled to claim 10.5 overtime hours); and April 18, 2014 (when the defendant claimed 10 overtime hours while being entitled to claim only 5.7 overtime hours)—the defendant gave only a vague defense.  He testified that he put down on his wage voucher the hours given to him by the McCabe timekeeper.  Tr. 3 at 66.  He also added, however, that the "general practice" when he was shorted hours was to add it to the following week on a day they were on union leave.  *Id.*

But that defense was inconsistent with his other defense that he was merely listing the hours given to him by the McCabe dispatcher.  In other words, did the defendant merely repeat and list the hours the McCabe dispatcher gave him—and that accounts for the inaccuracies on his wage voucher (Exh. 13) for April 15, 16, and 18—or did he inflate his hours for those days to correct shortages from the prior week?  It was unclear from the defendant's direct testimony which defense he was claiming for those three days of inaccurate entries.

In any event, on cross-examination, the defendant's direct testimony was shown to be false, for multiple reasons:

First, the defendant acknowledged that nowhere in the logbook did it indicate that he had worked at all on Sunday, April 6, 2014, or Sunday, April 13, 2014.  Tr. 3 at 69.  Then, remarkably, he had the following colloquy with the prosecutor:

15

**Q.  So my question is did you work at all Sunday, April 6, 2014?**

**A.  I cannot remember.**

*Id.* at 70 (emphasis added).

The defendant gave that remarkable answer after testifying emphatically on direct examination—as described above—that he had worked both Sundays (i.e., April 6 & 13, 2014) and that he was actually *underpaid* by the union for the "rest time" he had "earned" on those days even though he didn't work on those days.

Second, and much more important, after the Government produced the defendant's pay stubs for the time periods which included Sunday, April 6, 2014, and Sunday, April 13, 2014, which were received in evidence as Exhibits 70 and 71, respectively, the defendant admitted that he did not work on either April 6, 2014, or April 13, 2014.  Tr. 3 at 87-88:

**Q.  So for Monday, April 7th, that 14.5 hours does not include any hours that you worked on April 6th *'cause you didn't work on April 6th, right?***

**A.  That is correct.**

Tr. 3 at 87-88 (emphasis added).

Once the defendant's claimed defense that he had worked on Sunday, April 6, 2014, and Sunday, April 13, 2014, was contradicted by his pay stubs covering those two days (Exhs. 70 and 71, respectively), the defendant switched gears and tried an alternative defense.  He then claimed that he was entitled to be paid for those two Sundays pursuant to the Collective Bargaining Agreement (CBA) (Exh.

16

16) as "rest time."  Tr. 3 at 88.  The prosecutor asked the defendant to identify where in the CBA it authorized him to get paid for "rest time" on a Sunday when he did not work at all on that day.  *Id.* at 89.  The defendant claimed it was on page 12, section 9.03 of the CBA.  *Id.*  However, that provision required the employee to have actually worked a "shift of five (5) or more continuous hours" for an employee to qualify for "rest time" and *it did not apply where, as here, the defendant had not worked any shift on either Sunday.*  Indeed, the defendant eventually admitted that the CBA did not support his defense that he was entitled to claim "lost time" wages for the two Sundays.  *Id.* at 92.

The defendant then, once again, tried another defense by disregarding the CBA—because it contradicted his argument—by claiming it was the "practice" to get paid for such "rest time" even though he was not entitled to it by the CBA.  *Id.* at 90.  The defendant claimed that "practice" had been passed onto him "by former officers" of the union.  *Id.* at 90-91.   That so-called "practice," however, if it indeed existed, was contrary to the CBA and any union employee who conducted that practice, like the defendant in this case, *also* stole money from the union for "lost time" wages to which they were not entitled.  Indeed, the defendant's claimed "practice" was merely a euphemism for stealing money from the union by claiming "lost time" wages for which he was not entitled.  Even if others have committed the same type of theft, it does not provide a legal defense for the defendant.

The prosecutor asked the defendant why he didn't simply list April 6, 2014, on his wage voucher for that week (Exh. 12) if he was entitled to get paid for "lost time" wages for that day. *Id.* at 93-94. The defendant responded that it was his practice not to have a separate line on the wage voucher for "lost time" wages earned on Sundays and that instead he would add it to the following Mondays. *Id.* at 94. The defendant then went a step further. He testified that he did not put his "lost time" wages for Sunday, April 13, 2014, on the first line of the wage voucher for that week (Exh. 13) because he "*never*" separately listed "lost time" wages for a Sunday and instead *always* added it to the following Monday. *Id.* at 95.

The prosecutor challenged that testimony by presenting the defendant with 12 instances where the defendant had, in fact, claimed "lost time" wages earned on Sundays, with itemized lines for those Sundays, without carrying over the hours to the following Mondays. Tr. 3 at 98-114. At the conclusion of that process, the defendant admitted that it *was*, in fact, a regular practice of his to do a separate line on the wage voucher for Sundays for "lost time" hours. *Id.* at 114.

Finally, with respect to the defendant's claim on his wage voucher for April 15, 2014 (Exh. 13) that he was entitled to 10 hours of overtime hours for that day, even though no one in his crew worked, the defendant admitted that his wage voucher was contrary to the McCabe logbook. *Id.* at 116-17. However, his explanation for the error was to blame it on the McCabe dispatchers. *Id.* at 117.

**Conclusion as to the Third Element of Counts 1 and 3**

The Government has proven beyond a reasonable doubt that the defendant's wage voucher for the week of April 7, 2014 (Exh. 12) and his wage voucher for the week of April 14, 2014 (Exh. 13), contained false entries.  Exhibit 12 had a false entry for April 7, 2014, when the defendant claimed he was entitled to 14.5 overtime hours when he was entitled only to 9 overtime hours.  Exhibit 13 had false entries for April 14, 15, 16, and 18, 2014.  These are all summarized in Exhibit 22, which is based upon the logbook, the wage vouchers, the pay stubs, and the testimony of Mr. Arakawa, Mr. Cutter, Ms. Chock, and Ms. Moenahele.

### 4)  The defendant acted willfully in making the false entries on the two wage vouchers (Exhibits 12 and 13).

The fourth and final element for Counts 1 and 3 is whether the defendant acted "willfully" in making those false entries described above and summarized on Exhibit 22.  As noted in the Government's Trial Brief, the term "willfully" as used in 29 U.S.C. § 439(c) means the Government had to prove that the defendant acted knowingly and intentionally, not through ignorance, mistake or accident.  *United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997).

The proof that the defendant acted knowingly and intentionally in submitting the two vouchers (Exhibits 12 and 13) with the false entries comes, in part, from the fact that it was part of a pattern and practice conducted by the defendant that lasted more than four years.  Ms. Moenahele testified that she examined: (1) all of

the wage vouchers submitted by the defendant while he was the Secretary-Treasurer of the Longshore Division, that is, from December 2009 through April 2014; (2) all of the logbook entries for the defendant and his crew during the same time period; and (3) all of the McCabe pay stubs for the defendant and his crew relevant to the issues that arose during the trial. Based upon her extensive analysis of those records, Ms. Moenahele prepared a number of tables which were received in evidence as Exhibit 61. Tr. 2 at 33-46. The final page of that exhibit (i.e., page 22) is a much simpler table which summarizes the other tables which are part of Exhibit 61. See Tr. 2 at 45-46 (test. of Ms. Moenahele).

The last page of Exhibit 61 (i.e., page 22 of Exhibit 61) reflects that from December 2009 until the end of April 2014, the defendant submitted 818 entries on his wage vouchers. (Each wage voucher contained multiple entries.). Of those 818 entries, 386 of them contained "overcharges," i.e., the defendant claimed more "lost time" hours than he was entitled to claim. This amounted to approximately 47 percent of all of the defendant's entries, or almost half of them. That is a number far too great to be considered a mistake, an accident, or unintentional.

Indeed, if those false entries were simply a mistake made by the McCabe dispatchers or made by the defendant, one would expect that the number of "overcharges" would roughly equal the number of "undercharges." It should be like flipping a coin, with heads and tails coming up roughly equally. But, here,

while the overcharges were 386 entries, the undercharges were only 74 entries, a disparity greater than 5 to 1.  A person doesn't have to be a mathematician or a statistician to realize that the defendant's overcharges were not due to mistakes or some random error.  Rather, they were done knowingly and intentionally by the defendant to benefit himself financially, to the tune of *at least* $96,000, as calculated by Ms. Moenahele.  Tr. 2 at 48 (test. of Ms. Moenahele).  The defendant knew exactly what he was doing—and he intended the results he obtained—that is, a theft of at least $96,000 in money that belonged to his fellow union members.  In doing so, he violated the trust they placed in him as their Secretary-Treasurer.

In addition, as summarized in Exhibit 32, and as explained in the combined testimony of Mr. Cutter, Ms. Chock, and Ms. Moenahele, in at least 27 different instances, the defendant claimed 7.5-16 hours of "lost time" on days when no machine operators in his crew worked or when 1-3 machine operators in his crew worked, with none of those 1-3 employees being the person below him on the lineups.  Tr. 2 at 23-29.  *In other words, on those 27 days, including April 15, 2014—which is part of the charges in Counts 2 and 4 of the Indictment—the defendant was entitled to **zero hours** of "lost time." Yet, as summarized in Exhibit 32, he submitted "lost time" vouchers resulting in him receiving **$12,966.38** from the union for claimed "lost time" wages.*  Those 27 false claims for "lost time" wages may be the most compelling evidence of the defendant's fraudulent intent.

21

Finally, the defendant's claim that on those 27 days, and the other disputed days, he merely inserted on his wage vouchers the hours given to him by the McCabe dispatchers, is not even close to being credible.  That would mean that the McCabe dispatchers erred with all 818 overcharged entries, *and* with all 74 undercharged entries, submitted by the defendant that are summarized on the last page of Exhibit 61.  That also would mean that the dispatchers—*who needed to accurately maintain the logbook because the lineups for the following weeks depended upon the logbook being accurate*—would have erred on more than 50 percent of all entries provided to the defendant over a four-year period.  Indeed, an error rate like that would have defeated a primary purpose for even having a logbook and it would have been a disaster for both McCabe and the union because the lineups for the following weeks would have been in error 50 percent of the time, resulting in some workers being grossly penalized by receiving fewer work hours than they were entitled to receive.

In truth, as Mr. Cutter testified, and as the defendant's witness, Peter Hashimoto, also testified, the dispatchers strove to prepare an accurate logbook. See Tr. 1 at 110-11 (test. of Mr. Cutter); Tr. 3 at 40-41 (test. of Mr. Hashimoto). Thus, the defendant's explanation—that his wage voucher entries were faulty because he relied upon faulty information he received from the dispatchers—is not even close to being credible.  It is nothing more than a "Hail Mary" defense.

### III.  The Elements of the Offenses Charged in Counts 2 and 4

As stated in the Government's Trial Brief (Dkt. 58), the elements of Counts

2 and 4 of the Indictment, which charge violations of 29 U.S.C. § 501(c), are:

1) First, that the Longshore Division of the ILWU, Local 142, was a "labor organization" engaged in an industry affecting interstate or foreign commerce."

2) Second, Mr. Brown was an officer of the Hawaii Longshore Division;

3) Third, that on or about April 14, 2014 (with respect to Count 2) and on or about April 21, 2014 (with respect to Count 4), Mr. Brown knowingly embezzled or converted to his own use monies or funds of the Longshore Division; and

4) Fourth, Mr. Brown acted unlawfully, willfully, and with the fraudulent intent to deprive the Hawaii Longshore Division of its monies or funds.

Government's Trial Brief at 15.

The Government will now address those elements in seriatim.

### 1)  The Longshore Division of the ILWU, Local 142, was a "labor organization engaged in an industry affecting interstate or foreign commerce."

The Government proved that the Hawaii Longshore Division of the ILWU,

Local 142, was a "labor organization engaged in an industry affecting interstate or

foreign commerce," as that term is defined in 29 U.S.C. 402(j), via the Collective

Bargaining Agreement that the Longshore Division had with McCabe (Exh. 16);

the filing of the LM-2s by the Longshore Division with the U.S. Department of

Labor (Exh. 33); and the testimony of Mr. Cutter (Tr. 1 at 98-99).

### 2) **Mr. Brown was an officer of the Hawaii Longshore Division.**

It is undisputed that the defendant, as the Secretary-Treasurer of the Longshore Division, was an officer of that union.  See 29 U.S.C. § 402(n).

### 3) **On April 14, 2014 (with respect to Count 2) and on April 21, 2014 (with respect to Count 4), Mr. Brown knowingly embezzled and converted to his own use monies of the Longshore Division.**

Exhibits 12 and 13 were the two wage vouchers submitted by the defendant that contained the false entries for April 7, 14, 15, 16, and 18, 2014.  The defendant obtained overpayments from the Longshore Division for those five false entries in the amounts listed on Exhibit 22 ($309.38 for April 7; $253.13 for April 14, 2014; $562.50 for April 15, 2014; $56.25 for April 16, 2014; and $243.75 for April 18, 2014).  The fact that the defendant's two wage vouchers were processed by Local 142 into checks deposited into the defendant's bank account was proven via: the testimony of Mr. Arakawa (Tr. 1 at 40-44); the pay stubs (Exhs. 14 and 15); the bank records (Exh. 23); and the testimony of  William Akamine (Tr. 1 at 73-76).

### 4) **Mr. Brown acted unlawfully, willfully, and with the fraudulent intent to deprive the Hawaii Longshore Division of its funds.**

To satisfy the fourth element of Counts 2 and 4, the Government must prove that Mr. Brown acted with a fraudulent intent or a bad purpose or an evil motive.  *See United States v. Wiseman*, 274 F.3d 1235, 1240 (9th Cir. 2001).  "While the defendant must 'knowingly act wrongfully to deprive another of property,' there is no requirement that the defendant also know his conduct was illegal."  *Id.*

The evidence of the defendant's fraudulent intent for Counts 2 and 4 mirrors the intent evidence for Counts 1 and 3.  In sum, the defendant stole money from the union members by inflating his "lost time" hours on his wage vouchers for April 7, 14, 15, 16, and 18, 2014.  Those thefts were the latest in a long string of thefts committed by the defendant over a span of more than four years, totaling about $96,000.  The Government proved this element beyond a reasonable doubt in its case-in-chief and the defendant's contrary testimony was completely lacking in credibility.  In truth, the defendant did *not* work Sunday, April 6, 2014, or Sunday, April 13, 2014, like he claimed during his direct testimony.  In truth, the defendant *did* include separate line items on his wage vouchers for work on other Sundays, despite his testimony that he never did so.  In truth, the defendant was *not* entitled to claim "rest time" under the CBA—like he claimed—because he did *not* work at all on those two Sundays.  In sum, the Government proved beyond a reasonable doubt all of the elements for all four counts of the Indictment.  Accordingly, the Government respectfully requests a verdict of Guilty as to all four counts.

Dated: May 19, 2022, at Honolulu, Hawaii.

CLARE E. CONNORS
United States Attorney
District of Hawaii

By      */s/ Marshall H. Silverberg*
MARSHALL H. SILVERBERG
Assistant U.S. Attorney
NICOLE K. HUDSPETH
Special Assistant U.S. Attorney