Law Offices Of:
HARRISON & MATSUOKA

WILLIAM A. HARRISON    #2948
American Savings Bank Tower
1001 Bishop Street, Suite 1180
Honolulu, Hawaii  96813
Telephone Number:   (808) 523-7041
Facsimile Number:  (808) 538-7579
E-Mail:  wharrison@hamlaw.net

Attorney for Defendant
CHARLES KIMO BROWN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 19-00046 (LEK) |
| | ) | |
| Plaintiff, | ) | **DEFENDANT CHARLES KIMO** |
| | ) | **BROWN'S CLOSING** |
| vs. | ) | **STATEMENT**; EXHIBIT "37 ;" |
| | ) | CERTIFICATE OF SERVICE |
| CHARLES KIMO BROWN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## **DEFENDANT CHARLES KIMO BROWN'S CLOSING STATEMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………….....   ii

I.   INTRODUCTION…………………………………………….....   2

II.   THE GOVERNMENT FAILED TO PROVE BEYOND A
REASONABLE DOUBT THAT MR. BROWN DID WILLFULLY
MAKE AND CAUSE TO BE MADE A FALSE ENTRY IN HIS ILWU
WAGE VOUCHERS ………………………………………………   3

   A.   Mr. Brown Followed The Normal Practice of Obtaining One's
Work Hours…………………………………………………...   5

   B.   Where Hours are Placed on the Work Voucher is of no
Significance …………………………………………………...   9

   C.   The Government Failed to Produce any Evidence to Support
the Necessary Fraudulent Requisite Intent to Obtain a
Conviction…………………………………………………...   11

III.   SUMMARY……………………………………………………...   23

# TABLE OF AUTHORITIES

## <u>Cases</u>

**Page(s)**

*Felton v. United States,* 96 U.S. 699 [24 L.Ed. 875]……………….............   4

*Potter v. United States,* 155 U.S. 438 [15 S.Ct. 144, 39 L.Ed. 214]……….   4

*Ratzlaf v. United States*, 510 U.S. 135, 141 (1994)………………………   4

*Spies v. United States*, 317 U.S. 592, 497, 63 S.Ct. 3645, 367, 87 L.Ed.
   418 (1943)……………………………………………………………..   4

*Spurr v. United States,* 174 U.S. 728 [19 S.Ct. 812, 43 L.Ed. 1150])……...   4

*Toussie v. United States,* 397 U.S. 112, 114-115, 90 S.Ct. 858, 860, 25
   L.Ed.2d 156 (1970)………………………………………………....   12

*U.S. v. Marion*, 404 U.S. 307,323, 92 S.C. 455,465, 30
   L.Ed.2d 468 (1971)…………………………………………………   12

*United States v. Awad*, 551 F.3d 930, 939 (9th Cir. 2009)………………...   4

*United States v. Berry*, 683 F.3d 1015, 1021 (9th Cir. 2012)………...........   4

## FEDERAL STATUTES

**Page(s)**

18 U.S.C § 3282……………………………………………………………   2

## I. **INTRODUCTION**

On April 11, 2019, a four count Indictment was brought against Charles Kimo Brown by the United States alleging (1) falsification of union records and (2) theft of union funds from April 11, 2014 to and including April 21, 2014. *See DKT.#1.*

Count 1 of the indictment was literally filed on the last day allowed under the statute of limitations. Count 2 within 3 days of the running of the statute of limitations. Count 3 within 7 days, and Count 4 within 10 days of being time barred. *See 18 U.S.C § 3282.*

Prior to filing the charges against Mr. Brown, the United States provided him with a "Queen for a Day" interview. TR. 2, 56:15-19. [1] At the time Mr. Brown was assured he was not a subject or target of the government but merely a witness. TR. 2, 57:23-25; 58:13-16. At the interview the government sought information concerning allegations of wrongdoing by the then Hawaii Longshore Division Director, ILWU Local 142. TR. 2, 55:13-25; 56:1-19. At the interview Mr. Brown informed the United States that he did not have any such

---

[1] TR. 1; page: lines = transcript of the trial on April 5, 2022 (Dkt.# 71); TR. 2 = transcript of trial on April 6, 2022 (Dkt.# 72); TR. 3 = transcript of the trial on April 7, 2022 (Dkt.# 73).

relevant information. TR. 2, 56:23-25; 57:1-2.  It was after this meeting that the then "witness," Mr. Brown,  was indicted for allegations noted above. These allegations amounted to the alleged theft of union funds in the amount of $393.75 in Count 2 and $1,181.25 in Count 4, based upon claims of the falsification of union voucher forms.

The sole thrust of the government's case at trial was proving that the McCabe Hamilton & Renny Co. Ltd.'s log book and time sheets did not match the wage vouchers submitted by Mr. Brown. That alone is not indicative of the commission of a crime. The government must prove criminal intent. The remainder of this closing statement will set forth the reasons why the government failed to prove beyond a reasonable doubt that Mr. Brown did "*willfully* make and cause to be made a false entry" in wage vouchers submitted to the ILWU (Counts 1 and 3). Further, why the United States failed to prove that  Mr. Brown "did *knowingly* embezzle and convert to his own use monies and funds of the Longshore Division" (Counts 2 and 4).

II. **THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT MR. BROWN DID WILLFULLY MAKE AND CAUSE TO BE MADE A FALSE ENTRY IN HIS ILWU WAGE VOUCHERS**

Unlike many words which have been defined, there is no single Ninth Circuit definition for the term "willfully." See, *5.5, Manual of Model Criminal Jury Instructions, for the District Courts of the Ninth Circuit (2010 Ed.)*.

As the Supreme Court has observed, "willful" is a word of "many meanings" and "its construction [is] often . . . influenced by its context." *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994); see also *Spies v. United States*, 317 U.S. 592, 497, 63 S.Ct. 3645, 367, 87 L.Ed. 418 (1943). In its most basic sense, it is a deliberate act as opposed to unwitting conduct. However, that deliberate act typically requires a culpable state of mind. *United States v. Berry*, 683 F.3d 1015, 1021 (9th Cir. 2012) (in prosecution for social security fraud, "willfully" connotes "culpable state of mind"). "The word often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose (*Felton v. United States,* 96 U.S. 699 [24 L.Ed. 875]; *Potter v. United States,* 155 U.S. 438 [15 S.Ct. 144, 39 L.Ed. 214]; *Spurr v. United States,* 174 U.S. 728 [19 S.Ct. 812, 43 L.Ed. 1150]); *United States v. Awad*, 551 F.3d 930, 939 (9th Cir. 2009) (in health care fraud case, "willful" act is one undertaken with "bad purpose" with knowledge that conduct was unlawful).

4

What is clear is that Mr. Brown cannot be found have "willfully" caused a false entry to be made if he did not do so with a culpable state of mind i.e., with a bad purpose.

## A.   Mr. Brown Followed The Normal Practice of Obtaining One's Work Hours

The clear import of trial testimony regarding the receipt of work schedules, which we submit is unequivocal, was that machine operators normally obtained their work hours by calling in to the dispatchers/ timekeepers.

> Q.    Okay. So what was the normal procedure during the time that you were working at McCabe as a timekeeper? What was the normal procedure for individuals who are on union leave to obtain their hours missed while on union leave?
>
> A.  Typically an official would come into the office or either call us -- or call the office or call us on our cell phones to ask what their lost wages were for that day.
>
> Q.    Okay. And this was if someone were to work a week on union leave, they would call in when to get their hours for that week?
>
> A. It really depends on the individual. Some would call daily or some would just call I guess prior to whenever their voucher was due.
>
> Q.    Okay. And then you would tell them what you

*believed to be their work hours?*

*A.  That is correct, whatever their lost time –*

*whatever they're entitled to their lost time.*

*Q.     And that was standard practice just calling in?*

*A.     That is correct.*

TR. 3, 32:6-25;   (Peter Kauaoanuenue Hashimoto discussing procedures

during his employment at McCabe as a  dispatcher/timekeeper.)

*Q.     Okay. Now, let's talk about these -- well, first of*

*all, so your time that you put in these forms, you relied*

*solely on the timekeeper and dispatcher to give you that?*

*A.     Yes.*

TR. 2; 135: 21-25; (testimony of William Papaiku Haole, IV discussing the

union voucher forms.)

*Q.     Okay. Just a couple of few additional questions*

*here.*

*Your scheduling of your time while you were on union*

*duty -- and the schedules that you get are solely  verbal?*

*There's no written schedules?*

*A.     In the beginning, yes, was verbal, we just call them*

*on the phone. But during the course of this investigation, we changed the*

*process.*

*Q.     Okay. All right. When did that process change?*

*A.     Gee, I not too sure when. Might have been 2017*

*maybe.*

*Q.     And one of the things that really is the crux of*

6

*this is when you get these -- these callouts, you call and you find out what -- what your work week is like, you just write it down and then just put it in your voucher and then someone converts it, and that's how you basically believe that that's your work week?*

*A.     Yes.*

*Q.     Okay. So you're basically relying on the correctness of the timekeeper?*

*A.     We're relying on, you know, honesty over here.*

*Q.     Okay. And you've told us already that -- that sometimes those schedules you got were incorrect?*

*A.  Yes.*

*Id.* 148:1-24.

Mr. Brown followed that same standard procedure. He testified he would call the timekeepers to obtain a verbal response and he would *immediately* place on the voucher the time verbally given, TR. 3; 53:22-25; 54:1-5.

*Q.     (BY MR. HARRISON:) Okay. What would you do on your vouchers?*

*A.     I would call the timekeepers at the end of the week and I would get my time verbally from them over the phone.*

*Q.     And was there any kind of a written record that you could look at to see what your time was, or were you just relying on the verbal responses from the timekeepers?*

*A.     It was always verbally over the phone.*

7

> Q.    Okay. And how would you record the time they gave you if you were
> on union leave? What would you do with that information?
>
> A.    As soon as they give me the time verbally over the phone, I would
> have my voucher in front of me and I would put down the lost time for that
> week that I was on union leave.
>
> For every day that I was on union leave, they would give me the
> lost time over the phone and I would enter it onto my wage
> voucher sheet.
>
> Q.    And you would enter it directly from what they told
> you?
>
> A.  Yes.

Similarly, he testified:

> Q.    Okay. And we've already established that your general practice at
> that time was to call in for your time. And what would you do when you got
> yourtime?
>
> A.    I had my wage voucher in front of me and they gave
> me the time over the phone and I wrote it on my voucher.

TR. 3, 125:20-24. *See also* 126:9-21; 127:2-15; 128:24-25; 129:1-3.

Mr. Brown was examined by the government at length about this procedure and did not once deviate in his answer. See TR. 3, 81:1-2; 84:9-11; 84:14; 84:25; 85:1; 139:16-20.

Even the court acknowledged this fact:

> THE COURT: He has been consistent in saying he
> relied on what he was told when he called up to the timekeeper.

8

TR. 3, 133:11-12.

**B.**  **Where Hours are Placed on the Work Voucher is of no Significance**

The government spent a significant amount of time discussing the fact that Mr. Brown used a practice of putting his Sunday evening union time in the following week's voucher under a different date. The government offered this evidence to infer that his actions somehow suggested fraudulent intent. This argument is clearly fallacious. William Haole testified that the procedure undertaken by Mr. Brown was the standard practice for union officers.

> *Q.     Okay. So what's the procedure in recouping that time? How do you go about requesting from the union the time that you missed?*
>
> *A.     Well, if you're short-timed, then we would approach the secretary-treasurers and we'll let them know that we had more hours than they told us we had. And from there, they would just tell us because payroll is closed, we would put those hours on the following week.*
>
> *Q.     Okay. You'd put those hours on the following week voucher?*
>
> *A.     Yes.*
>
> *Q.     Okay. Now, what -- for instance, where would you put those hours on the following week voucher?*

9

A.      Mainly wherever they tell us -- or where the secretary-treasurers tell us to put it.

Q.      Okay. What was the procedure -- and you say secretary-treasurer. When -- was there multiple secretary- secretary-treasurers when you were working at McCabe over the time course -- time period between 2009 and -- I'm sorry – 1988 to 2011?

A.      No, there was only Kimo and Drake.

Q.      Drake?

A.      Yeah.

Q.      Was there another individual Jones that was --

A.      On the union level before the division, yeah, you had David Jones. He was a secretary-treasurer for the unit.

Q.      Okay. And did he issue an order as to how you were to fill out these forms?

A.      Yes.

Q.      Okay. And what was the procedure to fill out these forms?

A.      Well, he would just tell us on the following week on a Monday or Tuesday on an open day, just put your hours over there.

Q.      Okay. So on Monday or Tuesday or an open day. When you say "open day," a day that you weren't supposed to work?

A.       Yeah, one day that I wasn't on union leave.

Q.       Okay. All right. So it was just to recoup the

10

> *time. It didn't really matter what day you put it in just to*
>
> *recoup the time?*
>
> *A.     Yes.*

TR. 2, 139:17-25; 140:1-25; 141:1-9.

In fact, even the government's supervising agent had to admit that the sole purpose of submitting a voucher was obviously to recoup your time.

> *Q.     Are you aware of the fact that union members when*
> *they do that will find an appropriate place to put those hours*
> *that they're claiming they were shorted the prior week?*
>
> *A.     I would assume they would submit something with the correct date*
> *and the corrected hours, the amount of the shortage.*
>
> *Q.     Or put it on a voucher and a time period in which there was no work?*
>
> *A.     If -- if the person is due that money, then certainly.*

TR. 2, 84:8-17 (Testimony of Pearl Moenahele).

## *C.*   **The Government Failed to Produce any Evidence to Support the Necessary Fraudulent Requisite Intent to Obtain a Conviction**

As set forth above it is the government's burden to prove, beyond a reasonable doubt, that Mr. Brown actions in completing and submitting the voucher forms were done with fraudulent intent –that is willfully.  Not one witness testified during the trial, nor could they, that the verbal information

11

given to Mr. Brown by the dispatcher/timekeeper (some 5 years earlier)[2] deviated from the information contained on the wage vouchers submitted. The best that anyone could claim is that the wage voucher showed an amount that differed from the log book or time sheet for the period in question. The government's own witness Agent Pearl Moenahele, confirmed this fact.

> Q.     And there -- you've already testified there were no source documents for the wage vouchers; is that correct?
>
> A.     That's correct.
>
> Q.     And did you come to learn why?
>
> A.     Yes.
>
> Q.     What they relied on instead?
>
> A.     Yes.

---

[2] The five-year time period between the alleged act and indictment assured the government that Mr. Brown would have a difficult time defending himself. Just the type of occurrence the statute of limitation seeks to shield against.   Indeed, "The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. ***Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time*** and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *U.S. v. Marion*, 404 U.S. 307,323, 92 S.C. 455,465, 30 L.Ed.2d 468 (1971), *citing Toussie v. United States*, 397 U.S. 112, 114-115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). [Emphasis added].

*Q.     And what was that?*

*A.     They relied on the honor system to report the*

*numbers on the wage vouchers.*

TR. 1, 17:12-21.

But if Mr. Brown obtained the information directly from the

dispatcher/timekeeper and placed it directly on the voucher at the time it was

given, there is absolutely no proof that his conduct can be deemed willful.

Quite the opposite, he was following what was the standard practice.

Moreover, it is obvious from the testimony of all who maintained the

records that the log book and time records were not sacrosanct. Indeed, errors

took place.

*Q.     Okay. Now, was it quite common for employees to*

*call the timekeeper complaining about missed hours?*

*A.     Yes.*

*Q.     What would happen if they complained about missed*

*hours? What was your procedure at that time?*

*A.     We have to go back and research, look at*

*the -- depending what the complaint was with regards to missed*

*hours, either it was inputted incorrectly or it wasn't*

*processed on payroll side. You know, there's*

*different -- different variables, I guess, different missed*

*hours.*

*But the main thing was to go back and research it and*

*check the recap, check the logbook, check the timesheet. Maybe*

*it was missed hour because the bango numbers got, you know,*

*invert -- not inverted, but just it was transferred incorrectly from the*

*timesheet to the recap, or even the supervisor wrote*

*the wrong bango number. So it could have been a number of*

*things that possibly could have been a wrong or -- yeah.*

TR. 3, 35:2-19;  (testimony of Peter Kauaoanuenue Hashimoto).

> *Q.     Okay. And that was the responsibility of the*
>
> *timekeeper to keep those accurate logs as well as timesheets,*
>
> *right?*
>
> *A.     Yes.*
>
> *Q.     But in your experience, was that always done?*
>
> *A.     During the time that I was there from my original hire date, no, lot of*
>
> *inconsistencies.*
>
> *Q.     Lot of inconsistencies?*
>
> *A.     Yes.*

*Id.* 37:8-16.

> *Q.     Mr. Hashimoto, you had made a statement earlier that there were*
>
> *inconsistencies and problems with the -- with the logbook and the*
>
> *timekeeper's sheet previously. You know that*
>
> *for a fact; is that correct?*
>
> *A.     Yes, sir.*
>
> *Q.     'Cause everyone makes mistakes. You admitted that you had made*
>
> *mistakes as well?*

A.   Yes.

Q.   And so when the government was asking you questions about Mr. Nakashima and other timekeepers, you were assuming that they were making correct entries, right?

A.   Based on how we were trained to do it, correct.

Q.   But that doesn't mean they didn't -- you know, they didn't make any mistakes; is that correct?

A.   Yeah, they could have made mistakes that gone unchecked.

Q.   Okay. And you were pretty particular in making sure that your records were kept correct, right?

A.   Yes.

Q.   But still yet you had errors that you made as well?

A.   Yes.

*Id.* 47:22-25; 48:1-4.

The government's own witness Kevin Cutter had to admit to "occasional" inconsistencies in the record keeping at McCabe:

Q.   And on occasion, the logbook was incorrect, right? There's discrepancies in the logbook?

A.   On occasion, yes.

Q.   Yeah. And the reason why people make these complaints to the timekeepers as well as management is based on these discrepancies, correct?

A.   Yes.

Q.   And you had testified earlier about people basically, like my client, asking other workers online what their hours were for that day?

> A.     Yes.
>
> Q.     And making a complaint based on the fact that his hours didn't match up to what their hours were, right?
>
> A.  Yes.

TR. 1, 163:12-25

> Q.     We've already established it's not always accurate, right?
>
> A.     Most of the time it is, though.
>
> Q.     But it's not always accurate; is that correct?
>
> A.     Not always, no.

*Id.* 190:9-13.

Finally, on this point even the United States had to admit that the inconsistencies went both ways. Agent Moenahele's investigation revealed that according to McCabe's records Mr. Brown was shortchanged hours which translated to hundreds of dollars that he did not recoup. *See Exhibits 27-31.*

As noted above the government's case solely hinged on a comparison of the vouchers submitted by Mr. Brown and McCabe's records, records which need not be accurate when it came to union leave. Why because McCabe was not footing the bill for those hours:

> Q.     Okay. Now, on your end, you're not concerned about that too much because McCabe's not paying that bill, right?

16

THE COURT: For what?

MR. HARRISON: For those -- those union hours that are -- that Mr.
Brown is receiving.

Q.    (BY MR. HARRISON:) That's not your kuleana; that's
the union's?

A.    My concern isn't what he gets paid. My concern is the hours that he
gets charged.

Q.    Okay. And the only reason why you're concerned
about that is because everyone who is in his situation as a machine operator
has certain amounts of time that they have to receive, right? And so you
want to make sure that everyone's equalled out in time? That's really your
concern?

A.    Yes.

Q.     Because that's what the contract allows in this
situation, right?

A.    Yes

Q.    Your collective bargaining agreement says that the low man on totem
pole gets the maximum amount of hours to catch up with everybodyelse?

A.    Yes.

Q.    That's your concern?

A.    Yes.

Q.    The actual hours worked for purposes of union business, that's not
your concern -- right? -- because you're not paying that?

A.    Not so much, no.

TR. 1, 166: 9-25; 167:1-11 (Statement of Kevin Cutter).

17

The point is, there was no real need to be concerned with keeping correct time records for hours that McCabe was not fiscally responsible for.

The government could not and more importantly for this case – did not prove that Mr. Brown received a penny above what he was not entitled to. The frustration in the way this matter was presented to the court can be found in the manner of accounting utilized by the government to support their admissibility under its 404(B) arguments. The governments Exhibits 27-31 are compilations in the form of spread sheets seemingly prepared to point out its claims that Mr. Brown stole an additional $96,000.00 over a four-year period. The compilation – again prepared to prove the "timesheets don't match vouchers" theory, also notes (according to the spread sheet) that Mr. Brown was "shorted" $768.75 for the period including April 2014. See Exhibit 30.

What makes this maddening is the simple fact that what would have been more fruitful would have been to compare the year end salaries for machine operators in Mr. Brown's gang with Mr. Brown's total wages for the year. Wages he received which included both union reimbursement and McCabe pay. Under that scenario had Mr. Browns overall pay been significantly larger than the other gang workers, there could have been an argument that something was amiss.

18

There were twelve workers in Mr. Brown's gang. Exhibit 37 contains the individual payroll sheets for the twelve, denoting the pay period from 11/28/11 -12/04/11. The form also contains the year to date ("YTD") totals for each worker. These payroll sheets are significant since they contain the TYD payroll which comprises nearly a year's worth of wages - 48 weeks to be exact. The figures in Exhibit 37 provides for a salary range of from a low of $48,294.83 up to a high of $132,989.90. The following spread sheet prepared from Exhibit 37 highlights this point:

| Name | Earnings YTD: 12/8/11 | Exhibit | Bate Stamp |
|------|----------------------|---------|------------|
| A.K.A | $106, 271.29 | 37 | Brown 013876 |
| A.P.S | $113,390.97 | 37 | Brown 014049 |
| J.L.K | $107,022.40 | 37 | Brown 014413 |
| D.M.K. | $132,989.90 | 37 | Brown 014222 |
| S.C.S | $ 99,121.39 | 37 | Brown 014659 |
| W.B.C | $ 102,889.63 | 37 | Brown 014902 |
| M.K.B. | $101,373.16 | 37 | Brown 015159 |
| A.D.V | $108,377.86 | 37 | Brown 015403 |
| D.A | $121,343.32 | 37 | Brown 015645 |
| R.K. | $ 76,466.22 | 37 | Brown 015904 |
| W.P.R | $ 48,294.83 | 37 | Brown 016069 |
| R.L. | $127,319.64 | 37 | Brown 016295 |

Using a rough calculation and some extrapolation one could assume the median income of the twelve would have been, at least $100,000.00 at year end. If the government could show that Mr. Brown's combined Local 142/McCabe

19

income well exceeded this amount  - maybe they would have a case. But even then, the government would have to factor in additional benefits given the Union Officers under the Collective Bargaining Agreement ("CBA"). The government did not do so, but merely relied on the "unexplained" differences between the voucher and the time records. Facts and records which were prejudicially old, five years old to be exact. Records which have proven to have been inaccurate at times.

In its case the government also seeks to draw the court's attention to Mr. Brown's alleged abuse of his union benefits and misreading of the CBA when it comes to the days on and off and rest time provisions. There was clearly a divergence of opinion as to how the provisions had been read and practiced by union officials. That being said, if certain union practices were traditionally carried  out in a certain manner, it should not be considered a willful violation of law for Mr. Brown to continue that practice. One such union practice was confirmed by Drake Delaforce,[3] the Secretary/Treasurer of Local 142 after Mr. Brown stepped down. Delaforce was asked whether you can claim time even if you declined work. He indicated that you can.

---

[3] Drake Delaforce was listed as a witness for the United States. He however was not called by the government but instead called by the defense.

> *THE COURT: Okay. If you're not scheduled to work*
> *on Sunday but the company calls you and you decline, can you*
> *claim any time on Monday for union leave?*
> *THE WITNESS: It depends on the start of the job*
> *time.*
> *THE COURT: Okay. So if it's --*
> *THE WITNESS: If it goes within the resting period,*
> *then, yes.*
> *THE COURT: Okay. Even though you declined it?*
> *THE WITNESS:  Correct.*
> *THE COURT: Okay. That clarifies it. Thank you*
> *very much.*

TR. 3, 23:24-25; 24:1-10 (Drake Delaforce responding to questions from the court).

Mr. Brown further testified that he was entitled to accrue his rest time whether he was on vacation, declined work or was off. He indicated the practice was in place when he was an official.  TR. 3, 128:1-25; 129:1-14. Other than questioning each witness regarding these practices, the government did not call any witness to rebut this unrefuted evidence.

Lastly, along these lines Mr. Brown also testified that he was entitled to Holiday pay *and* union pay if he was involved in union activity. See TR. 3, 139:4-25; 140:1-25; 141:1-8. The court followed up with Mr. Brown on this

matter:

> THE COURT: I just have a couple questions,
> Mr. Brown. For a day that's a paid holiday, if you are called in because there's an emergency or something, are you paid straight time or is there, you know, a multiplier because you're coming in -- you're called in on a holiday?

> THE DEFENDANT: Yes. Actually it's double straight time on the holiday pay. But we usually have a five-hour callout, so that's the reason why they gave me that time of nine straight time hours because it's a five-hour callout.

> But I'm giving them -- I'm providing what they're providing me over the phone. They're telling me whether it's straight time or overtime, and that's what I'm putting in my voucher.

> THE COURT: Okay. So you put nine hours straight time.

> THE DEFENDANT: That's correct.

> THE COURT: So you're telling me that on a holiday, Christmas and New Year's Day, that the timekeepers told you that was only straight time, there was no multiplier?

> THE DEFENDANT: That is correct.

> THE COURT:  Okay.

TR. 3, 141:13-25; 142:1-8

Again, the government did not call any witness to challenge Mr. Brown's assertions. If anything could be verified, this issue would have easily been the

one. On this matter the defense pointed out that if anything, Local 142's Trustees would have caught this matter in their LM-2 reviews of vouchers had there been any impropriety. See TR. 2, 144:9-25; 145:1-25; 146:1-5.

The evidence in support of this fact can be found in the ending testimony of Mr. Brown.

> *Q.   (BY MR. HARRISON:) Sir, if the union were to look at your wage vouchers for December 25th, January 1st, and January 2nd, and show time on those wage vouchers, would that be a red flag if there was no work on those days?*
>
> *A.   That would be correct. They would -- the trustees would go ahead and mark that down, and when we go back into executive session after the voucher review, they would  bring*
> *that issue up.*

TR. 3, 143:18-25.

## III.   <u>SUMMARY</u>

The duty of the United States is to prove its case beyond a reasonable doubt. It can do so in many ways but by any way it chooses it must leave the court "firmly convinced" Mr. Brown is guilty of the charged offenses. It has failed to do so in this case. The government asks this court to merely infer that since there are 5-year-old records at McCabe documenting for *their* records hours worked by their employees, Mr. Brown's vouchers, which may differ are

23

incorrect. This they offer in the light of the testimony of several individuals that the procedures utilized by the Longshoremen – verbal notification of hours – was the standard practice. This is offered in the face of record inconsistencies which allowed for the underpayment to employees. Inconsistencies for which the United States admits showed Mr. Brown "shorted" hours on several occasions.

Lastly, the *only* evidence adduced which spoke directly to this very issue was a question asked of William Haole by the United States and his response:

> Q.      *Now, with respect to Mr. Brown's vouchers, do you know as you sit here whether he was submitting accurate wage vouchers or not?*
>
> A.      *Well, it's an honor system. I believe he was.*

TR. 2, 153:11-14.

Justice prevails only when the government is held to its appropriate legal standard. That is the underlying notion of proof beyond a reasonable doubt, which Mr. Brown submits was not met in this case. Accordingly, the court should so find and acquit Mr. Brown of all four charges herein.

DATED: Honolulu, Hawaii, June 2, 2022.

Law Offices of:
HARRISON & MATSUOKA

WILLIAM A. HARRISON
Attorney for Defendant
CHARLES KIMO BROWN