UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>   vs.<br><br>CHARLES KIMO BROWN,<br><br>              Defendant. | CR. NO. 19-00046 LEK |

## DECISION

The instant case centers around whether the wage vouchers that Defendant Charles Kimo Brown ("Brown") submitted on April 11, 2014 and April 18, 2024 to the International Longshore and Warehouse Union Local 241 ("ILWU"), Hawaii Longshore Workers Division ("Longshore Division") contained false entries and whether Brown willfully made false entries on these wage vouchers.  If the Court determines that Plaintiff United States of America ("the Government") has carried its burden of proof on these two factual issues, then the Court must determine whether Brown knowingly embezzled or converted the Longshore Division's funds and whether he did so willfully with an intent to deprive the Longshore Division of its funds.

As set forth more fully below, the Court FINDS and CONCLUDES that the Government has shown by proof beyond a reasonable doubt that Brown is guilty of Counts 1, 2, 3, and 4.

**INTRODUCTION**

Brown is charged with four criminal counts: Counts 1 and 3 for Falsification of Financial Records of a Labor Union, in violation of 29 U.S.C. § 439(c) ("Counts 1 and 3"); and Counts 2 and 4 for Embezzlement of Labor Union Funds, in violation of 29 U.S.C. § 501(c) ("Counts 2 and 4"). See Indictment, filed 4/11/19 (dkt. no. 1). Specifically, Brown is alleged, as to Counts 1 and 3, to have willfully made a false entry in wage vouchers required to be kept by his union pursuant to federal law, and one wage voucher was for the period from April 7 to April 11, 2014 (Count 1), and the other was for the period from April 14 to April 18, 2014 (Count 3). [Id. at pgs. 4-5.]

As to Count 2, it is alleged that, "[o]n or about April 14, 2014, within the District of Hawaii, CHARLES KIMO BROWN, the defendant, while an officer of the Longshore Division, did knowingly embezzle and convert to his own use monies and funds of the Longshore Division in the approximate amount of $393.75." [Id. at pg. 4 (emphasis in original).]

As to Count 4, it is alleged that, "[o]n or about April 21, 2014, within the District of Hawaii, CHARLES KIMO BROWN, the defendant, while an officer of the Longshore Division, did knowingly embezzle and convert to his own use

monies and funds of the Longshore Division in the approximate amount of $1,181.25."  [Id. at pg. 5 (emphasis in original).]

Brown entered a plea of not guilty to all charges on April 22, 2019.  See Minutes - EP: Initial Appearance and Arraignment & Plea to the Indictment, filed 4/22/19 (dkt. no. 8).  On August 2, 2021, Brown was advised of his constitutional right to trial by jury, acknowledged his understanding of this right, and stated his desire to waive his right to jury.  See Minutes - EP: Waiver of Right to Jury Trial, filed 8/2/21 (dkt. no. 44).  His written waiver of jury trial was filed that same day.  See Waiver of Jury Trial and Consent to Be Tried by the Court, filed 8/2/21 (dkt. no. 43).

A non-jury trial was held on April 5 through 7, 2022 in this matter.  See Minutes - EP: Non Jury Trial (Day 1), filed 4/5/22 (dkt. no. 68); Minutes - EP: Non Jury Trial (Day 2), filed 4/6/22 (dkt. no. 69); Minutes - EP: Non Jury Trial (Day 3), filed 4/7/22 (dkt. no. 70).

The parties elected to submit their closing arguments in writing:  the Government filed its brief on May 19, 2022, Brown filed his brief on June 2, 2022, and the Government filed its rebuttal brief on June 9, 2022.  [Dkt. nos. 74, 75, 77.] This Court directed the Government to submit a supplemental brief regarding the Indictment's allegations regarding the approximate amounts embezzled in Counts 2 and 4.  See Minute

Order – EO: Court Order Directing the Filing of Limited Supplemental Briefing, filed 9/13/22 (dkt. no. 79).  The Government filed its supplemental brief on October 4, 2022 ("Government's Supplemental Brief"), and Brown filed his response brief on October 11, 2022 ("Brown Supplemental Brief"). [Dkt. nos. 80, 81.]

## STANDARDS

### I.  Falsification of Financial Records of Labor Union (Counts 1 and 3)

To convict Brown on Counts 1 and 3 for violations of 29 U.S.C. § 439(c), the Government must prove that he willfully made false entries on his union wage vouchers.  The statute provides:

> **(c)    False entry in or willful concealment, etc., of books and records**
>
> Any person who willfully makes a false entry in or willfully conceals, withholds, or destroys any books, records, reports, or statements required to be kept by any provision of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

29 U.S.C. § 439(c).  "Willfulness requires that an act be done knowingly and intentionally, not through ignorance, mistake or accident."  United States v. Morales, 108 F.3d 1031, 1037 (9th Cir. 1997) (citing *Ninth Circuit Manual of Model Jury Instructions–Criminal*, 5.05 (West 1995)).

4

## II.  **Embezzlement of Labor Union Funds (Counts 2 and 4)**

> Under § 501(c),
>
> Any person who embezzles, steals, or
> unlawfully and willfully abstracts or
> converts to his own use, or the use of
> another, any of the moneys, funds,
> securities, property, or other assets of a
> labor organization of which he is an
> officer, or by which he is employed,
> directly or indirectly . . . [is guilty of a
> felony].
>
> 29 U.S.C. § 501(c). The Ninth Circuit has held
> that the "essence" of this crime is the "taking
> of another's property knowing that the other
> person would not have wanted that to be done."
> United States v. Thordarson, 646 F.2d 1323, 1333
> (9th Cir. 1981) (*citing* United States v.
> Silverman, 430 F.2d 106, 126–27 (2nd Cir. 1970)).
> Fraudulent intent and conversion to defendant's
> own use or the use of another are elements of
> § 501(c), however, "lack of authorization or lack
> of good faith belief in union benefit" are not
> essential elements of this claim.  Id. at 1334–
> 35.

United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr.
Trades Dep't, 911 F. Supp. 2d 1118, 1137 (E.D. Wash. 2012),
*aff'd*, 770 F.3d 834 (9th Cir. 2014) (alterations in Bldg. &
Constr. Trades).  The definition of "embezzlement"

> encompasses the fraudulent appropriation of the
> property of another by one in lawful possession
> thereof.  See United States v. Dupee, 569 F.2d
> 1061, 1064 (9th Cir. 1978).  The concept of
> unlawful conversion encompasses the use of
> property, placed in one's custody for a limited
> purpose, in an unauthorized manner or to an
> unauthorized extent.  See Morissette v. United
> States, 342 U.S. 246, 272, 72 S. Ct. 240, 254, 96
> L. Ed. 288 (1952); Woxberg v. United States, [329
> F.2d 284 (9th Cir. 1964)].

5

United States v. Andreen, 628 F.2d 1236, 1241 (9th Cir. 1980).

Section 501(c), however, specifically pertains to "assets of a

labor organization of which he is an officer . . . ."  29 U.S.C.

§ 501(c).  Therefore,

> [t]he statute goes beyond traditional
> concepts of embezzlement, however, and imposes
> liability for an intentional breach of special
> fiduciary duties imposed by other regulatory
> statutes or governing instruments.  See 29 U.S.C.
> § 186(c).  The statute defines an offense "the
> common thread [of which] is that the defendant,
> at some stage of the game, has taken another
> person's property or caused it to be taken,
> knowing that the other person would not have
> wanted that to be done."  United States v.
> Silverman, 430 F.2d 106, 126-27 (2d Cir. 1970).
> The essence of the crime is theft and in the
> context of union funds or pension plans the
> offense includes a taking or appropriation that
> is unauthorized, if accomplished with specific
> criminal intent.  In this respect lack of
> authorization may be shown if the diversion is
> substantially inconsistent with the fiduciary
> purposes and objectives of the union funds or
> pension plan, as set forth by statutes, bylaws,
> charters, or trust documents which govern uses of
> the funds in question.  Whatever imprecision
> attends this definition is remedied substantially
> by the requirement of scienter, which is an
> essential element of the crime.  Cf. Screws v.
> United States, 325 U.S. 91, 65 S. Ct. 1031, 89 L.
> Ed. 1495 (1945).  The act to be criminal must be
> willful, which means an act done with a
> fraudulent intent or a bad purpose or an evil
> motive.

Andreen, 628 F.2d at 1241 (some alterations in Andreen)

(footnotes omitted).

Although no specific dollar amount is required by language of 29 U.S.C. § 501(c), Counts 2 and 4 of the Indictment charged Brown with embezzling approximately $393.75 and $1,181.25, respectively. See Indictment at pgs. 4-5. Thus, these approximate amounts are elements of the charged offenses. See, e.g., United States v. Marolda, 615 F.2d 867, 872 (9th Cir. 1980) (holding that, "having charged [the defendant] as it did in the indictment, the government was bound to show that the expenditures were neither properly authorized by nor beneficial to the union").

The Government argues Marolda has been effectively overruled by United States v. Miller, 471 U.S. 130 (1985). [Government's Supplemental Brief at 6.] This argument is rejected because Miller is distinguishable from Marolda. The indictment in Marolda alleged that additional circumstances, which were not required under the statute, were present in one offense, and therefore the Ninth Circuit held that the government was required to prove the offense as charged. See 615 F.2d at 869-70. In contrast, the indictment in Miller alleged two distinct types of fraud, and the government only prosecuted one type at trial. See 471 U.S. at 132. The United States Supreme Court held the defendant's "right to be tried only on offenses for which a grand jury has returned an indictment" was not violated because the government's

7

prosecution of only one type of fraud at trial "added nothing new to the grand jury's indictment and constituted no broadening." Id. at 145.  Because the cases are distinguishable, Marolda has not been overruled by Miller.

III. **Fiduciary Responsibility of Union Officers**

If Brown was an officer of the Longshore Division, then he had a statutorily imposed fiduciary duty to his labor organization.  Section 501(a) provides:

> (a)  **Duties of officers; exculpatory provisions and resolutions void**
>
> The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group.  It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.  A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

29 U.S.C. § 501(a).

**FACTUAL BACKGROUND**

## I.   Background

Brown has worked on the waterfront for thirty-three years, initially as a crane operator and currently as a machine operator.  [Transcript of Trial Proceedings (taken 4/7/22), filed 5/5/22 (dkt. no. 73) ("Tr. Day 3 Trans.") (Brown's testimony) at 52.]  He served as an officer of the Longshore Division as secretary-treasurer from December 2010 to 2014. [Id. at 52-53]  In 2014, Brown was employed at McCabe Renny & Hamilton Co., Ltd. ("McCabe") as a machine operator.  [Id. at 52; Transcript of Trial Proceedings (taken 4/5/22), filed 5/5/22 (dkt. no. 71) ("Tr. Day 1 Trans.") (testimony of Kevin Yutaka Cutter ("Cutter")) at 101.]

McCabe is a stevedore company that supplies workers for the loading and unloading of cargo ships used in interstate commerce.  [Tr. Day 1 Trans. (Cutter) at 96.]  Cutter is currently employed by McCabe as the vice-president of operations and, from 2009 to 2014, he was employed by McCabe as a dispatcher.  [Id. at 96-97.]  During that time, Cutter was one of three dispatchers.  [Id. at 158-59.]  His duties as a dispatcher included scheduling stevedores for work hours and turning in time sheets used to process paychecks for the

stevedores.  [Id. at 97.]  The stevedores are union members;
specifically, they are members of the Longshore Division.  [Id.
at 98.]

Kim Hudson Chock ("Chock") is the chief financial
officer for McCabe and has held that position since 2012.  [Id.
at 192 (Chock's testimony).]  She has been employed at McCabe
since 1997.  [Id.]  As part of her work duties, she reviews
financial information and communicates with governmental
agencies, and she is McCabe's custodian of financial records.
[Id. at 193.]  Among McCabe's financial records are:

-Exhibits 34 and 35, which are pay stubs for machine operators
    for the period of April 7, 2014 through April 13, 2014, and
    for the period of April 14, 2014 through April 20, 2014;
    see id. at 193-94, 198;

-Exhibit 37, which consists of: Brown's wage voucher for
    November 27, 2011 to December 2, 2011; an enlarged excerpt
    of the McCabe logbook for November 28, 2011 to December 4,
    2011; and payroll stubs for McCabe machine operators for
    that period; see id. at 215-16 (Exhibits 35 through 60
    received in evidence);

-Exhibit 40, which consists of: Brown's wage voucher for May 13,
    2012 to May 18, 2012; an enlarged excerpt of the McCabe
    logbook for May 14, 2012 to May 20, 2012; and payroll stubs
    for McCabe machine operators for that period; and

-Exhibit 42, which consists of: Brown's wage voucher for
    August 5, 2012 to August 10, 2012; an enlarged excerpt of
    the McCabe logbook for August 6, 2012 to August 12, 2012;
    and payroll stubs for McCabe machine operators for that
    period.

Matthew Arakawa ("Arakawa") is the ILWU accounting
supervisor.  [Tr. Day 1 Trans. (Arakawa) at 10.]   ILWU is an

employment labor organization and is required to file reports
with the United States Department of Labor.  [Id. at 9.]  The
Longshore Division represents workers on the docks, is part of
ILWU, and is semi-autonomous.  [Id. at 9-10.]  ILWU has 14,000
to 15,000 workers, and the Longshore Division has about 1,110
workers.  [Id. at 10.]  ILWU provides Longshore Division Workers
with office functions and access to all of it facilities, and
the Longshore Division contributes 50% of the dues it receives
to the ILWU.  [Id. at 10-11.]  The Longshore Division has an
executive board that includes a division director and a
secretary-treasurer.  [Id. at 12.]

      A.    **The Logbook**

      A logbook is kept by McCabe on a computer and is a
compilation of information from McCabe's business records and
reflects the hours worked by the stevedores ("Logbook").  [Tr.
Day 1 Trans. (Cutter) at 102; Tr. Exh. 24 (print outs of the
Logbook from to 12/28/09 to 5/11/14).]  Each stevedore is
assigned an employee number that is called a "bango" number.
See Tr. Day 1 Trans. at 104 (Cutter).  The dispatcher records in
the Logbook the hours worked by the stevedores, and each
stevedore is identified by bango number.  [Id.]  Brown's bango
number is 1088.  [Id.]  The machine operators work on a day
shift or a night shift.  [Id. at 103-04.]  Every two weeks,
these shifts are switched.  In the Logbook, the day shift hours

11

are noted in the Logbook using green ink, and the night shift hours are noted in the Logbook using black ink.  [Id. at 108.] Notations are used to indicate information about the work status of the stevedore: "UL" stands for "Union Leave" and this means that the stevedore was not at work for McCabe but was out on leave to conduct business for the union.  [Id. at 104.]  The equal sign "=" means that the date was scheduled as an off day. [Id. at 142; Tr. Exh. 41 at BROWN_013238-BROWN_013239.] Whenever there is an equal sign noted in the Logbook for bango number 1088, this means that Brown was not scheduled to work on that date, there are no hours worked listed for him, and he was not credited for any hours that he could claim as compensation for lost time in a voucher.  [Tr. Day 1 Trans. at 148 (Stipulation).]

     "LUM" represents "lumber" and refers to work in the lumber yard at Barber's Point for which one hour of straight time is paid for travel time.  See id. (Cutter) at 117; Tr. Exh. 20 (enlarged excerpt of the McCabe Logbook for the week of 4/14/14).  The hours worked reflected in the Logbook are entered the day after the shift has been completed.  See Tr. Day 1 Trans. (Cutter) at 166.  The supervisors fill out the timesheets and keep track of when the work started, how much time was taken for the lunch break, and when the work finished.  [Id. at 186.] The timesheets are turned over to the dispatcher at 7:00 a.m. on

12

the day after the day that the work was done.  [Id. at 180.]
The actual hours worked, as noted on the timesheets, is what is
entered into the Logbook.  [Id. at 186.]

      If a grievance is filed and it is determined that a
correction to the hours logged should be made, then the
corrections are sent to the payroll department, but the
correction is not noted on the timesheet.  [Id. at 172-73.]

      A lineup is created every Sunday, and a lineup is the
order that the employees are scheduled to work during the week,
based on the hours worked the previous week so that the work is
distributed equally.  [Id. at 110-11.]  The work schedules come
out around 4 o'clock the day before the work is to be done.
[Id. at 162.]  These schedules may have to be changed depending
on unforeseen circumstances such as work stoppages, workplace
accidents or computer malfunction.  [Id. at 161-62.]

    **B.**   **Vouchers**

      As a union officer, Brown was permitted to submit a
wage voucher for "lost time"; that is, time that he could have
worked for McCabe as a longshoreman but, instead, did work on
behalf of the union.  [Id. (Cutter) at 105; id. (Arakawa) at 11-
12.]  Brown was required to submit a wage voucher for
compensation of the "lost time" to the Longshore Division.  This
procedure involved an honor system wherein the union official
(here, Brown) fills out the wage voucher.  [Tr. Day 1 Trans.

(Arakawa) at 49-50.]  Brown would call the dispatcher and ask what his lost time was for the week, and the hours worked would be read from the Logbook.  [Id. (Cutter) at 139.]  The hours calculated for union leave is based on the hours worked by the person who was listed after Brown on the lineup.  [Id. at 139-42.]

## FINDINGS OF FACT

1.    The Longshore Division was a labor organization required to file annual reports (LM-2s) with the Secretary of Labor and to keep records on matters required to be reported in the annual reports.  [Tr. Day 1 Trans. (Arakawa) at 9-10, 33, 48; Tr. Exh. 33 (Form LM-2 Labor Organization Annual Report by the Longshore Division for the period from 1/1/10 to 12/31/10).]

2.    Wage vouchers submitted by union officials for reimbursement of lost wages incurred due to union work performed are included in the records required to be kept by the Longshore Division.  [Tr. Day 1 Trans. (Arakawa) at 33.]  Brown's wage vouchers are records that the Longshore Division was required by federal law to retain.  [Id.; Tr. Exh. 12 (ILWU Local 142 Wage Voucher for Brown for 4/7/14 to 4/11/14); Tr. Exh. 13 (ILWU Local 142 Wage Voucher for Brown for 4/14/14 to 4/18/14).]

3.    Brown was the secretary-treasurer for the Longshore Division.  [Tr. Day 1 Trans. (testimony of Lynette Martin ("Martin")) at 79.]

14

4.   Martin was an executive secretary for the Longshore Division and did administrative work.  She worked closely with Brown from 2010 to 2014.  [Id. at 78-80.]

5.   Martin would take completed wage voucher forms and turn the vouchers in to bookkeeping.  [Id. at 81-82.]  Wage vouchers are for Longshore Division officers that work at the union who have lost time because they are not working on the docks, and the vouchers are used to reimburse them for the time for which they would have been paid if they had been working on the docks and not conducting union business.  [Id. at 88.]  The wage voucher form must be completed for the officer to get paid, and the Longshore Division pays the wage voucher.  [Id.]

6.   Exhibit 12 is the wage voucher that the union officers fill out for lost time, and Martin recognizes it as a voucher filled out and signed by Brown.  [Id. at 80-81.]  It is the wage voucher for the period from April 7 through 11, 2014, and a total amount of $3,150.00 is claimed.  [Tr. Exh. 12.]  Brown claimed 14.5 hours of lost wages for April 7, 2014; 10.0 hours of lost wages for April 8, 2014; 11.5 hours of lost wages for April 9, 2014; 10.0 hours of lost wages for April 11, 2014; and 10.0 hours of lost wages for April 12, 2014.  [Id.]

7.   Exhibit 13 is also the wage voucher that union officers fill out for lost time, and Martin recognizes it as a voucher filled out and signed by Brown.  [Tr. Day 1 Trans.

15

(Martin) at 82-83.]   It is the wage voucher for the period from April 14 through 18, 2014, and a total amount of $3,150.00 is claimed.   [Tr. Exh. 13.]   Brown claimed 14.5 hours of lost wages for April 14, 2014; 10.0 hours of lost wages for April 15, 2014; 11.5 hours of lost wages for April 16, 2014; 10.0 hours of lost wages for April 17, 2014; and 10.0 hours of lost wages for April 18, 2014.   [Id.]

   8.   Brown was entitled to claim 9.0 hours overtime pay for union leave on Monday, April 7, 2014.   [Tr. Day 1 Trans. (Cutter) at 118-20; Tr. Exh. 19 (enlarged excerpt of the Logbook reflecting the hours worked by machine operator employees for the week of  4/7/14 to 4/13/14); Tr. Exh. 24 (Logbook).]

      a.   Because Brown claimed 14.5 hours overtime pay for union leave on April 7, 2014, he overstated his time by 5.5 hours.   [Tr. Exh. 12.]

      b.   Brown testified that the additional 5.5 hours represented rest time that he was entitled to following his night shift on Sunday, April 6, 2014.   [Tr. Day 3 Trans. (Brown) at 58-60.]

      c.   The Court finds that Brown's testimony as to this issue is not credible.   Brown testified on direct examination that he "came into work half a night on Sunday night" - *i.e.*, April 6, 2014 - and

16

> then [he] excused [him]self Sunday night at 2300,
> . . . because [he] was on a union leave for
> Monday.  So the collective bargaining agreement
> states that we need a minimum of eight hours of
> rest.  So when [he] went into Monday, [he's]
> entitled to the rest of those hours from 2400
> until the operation is complete for that Sunday
> night.

[Id. at 59.]  However, on cross-examination, Brown acknowledged
that neither the Logbook nor his payroll stub reflected that he
worked five hours on Sunday, April 6, 2014.  See id. at 73-74,
79-80; see also Tr. Exh. 70 (Brown's payroll stub from McCabe
for the week of 3/31/14 to 4/6/14).  He also acknowledged that
he did not work on April 6, 2014, but he asserted he was still
entitled to claim the rest time associated with his union leave
on April 7, 2014.  [Tr. Day 1 Trans. (Brown) at 87-88.]

        d.   Brown testified that it was the usual practice
for Longshore Division officers to claim the rest time as lost
time related to union leave scheduled for the following day,
even if the officer did not work on that day.  He testified that
the practice was in accordance with the collective bargaining
agreement.  [Id. at 87-89.]  The Court finds that this testimony
is not credible because the purported practice is inconsistent
with the cited provision of the collective bargaining agreement,
which requires the completion of work before entitlement to a
rest period, not merely being scheduled to work.  See Tr.
Exh. 16 (Longshore Agreement between McCabe and Local 142 for

17

7/1/08 to 6/30/14) at § 9.03 ("When employees **have completed** a shift of five (5) or more continuous hours work, they shall be allowed an eight (8)-hour rest period before they are recalled to the job." (emphasis added)).

e.   Brown then claimed that the practice was not memorialized in a written rule, but was common practice passed down verbally to union officers by former officers.  [Tr. Day 3 Trans. (Brown) at 90-91.]  The Court finds that this testimony is not credible, in part because Brown offered three different explanations for his addition of his April 6, 2014 rest time to his April 7, 2014 union leave hours.  To the extent that Drake Delaforce gave similar testimony to Brown's testimony about the practice of claiming rest time before union leave, see Tr. Day 3 Trans. (Delaforce) at 23-24, this Court also finds that Mr. Delaforce's testimony is not credible.

f.   Brown's overstatement of his hours for April 7, 2014 resulted in an overpayment of $309.38.

9.   Cutter testified that Brown was entitled to claim 10.0 hours of overtime pay as lost wages compensation for union leave on Monday, April 14, 2014 because Arick Valdez ("Valdez"), the employee next in line after Brown to work, worked 10.0 hours of overtime on April 14, 2014.  See Tr. Day 1 Trans. (Cutter) at 120-21; Tr. Exh. 20 (enlarged excerpt of the Logbook for 4/14/14 to 4/20/14); Tr. Exh. 24 (Logbook); see also Tr. Exh. 22

18

(Government's summary chart of Charged Conduct Discrepancies for April 7, 14, 15, 16, 18, 2014).

    a.   Brown claimed 14.5 hours overtime pay for union leave on April 14, 2014.  [Tr. Exh. 13 (Wage Voucher for 4/14/14 to 4/18/14).]

    b.   Brown testified that the additional 4.5 hours he claimed represented rest time that he was entitled to following his scheduled shift on Sunday, April 13, 2014.  [Tr. Day 3 Trans. (Brown) at 128-29.]

    c.   Brown also testified that he took a vacation day on Sunday, April 13, 2014 and received vacation pay.  See id. at 80; see also Tr. Exh. 71 (Brown's McCabe payroll stub for the week of 4/7/14 to 4/13/14, reflecting total gross pay of $335.52 for 9.0 hours of straight time as vacation pay for 4/13/14).

    d.   According to Brown, when he called the dispatcher for his April 13, 2014 schedule, Brown was informed he was scheduled to work that day.  Brown therefore claimed the rest time as part of his lost time for Monday, April 14, 2014.  [Tr. Day 3 Trans. (Brown) at 84-85.]

    e.   The Court finds that Brown's testimony regarding the additional 4.5 hours of lost time on Monday, April 14, 2014 is not credible, for the reasons set forth above as to the lost time claimed for Monday, April 7, 2014.

19

f.    In addition, when asked why he did not put the
Sunday, April 13, 2014 rest time on a separate line from the
Monday, April 14, 2014 union leave, Brown responded that he was
following the common practice to put Sunday and Monday time
together when filling out his wage vouchers.  He testified that
he never used separate lines for Sunday rest time.  [Id. at 95.]
However, Brown subsequently acknowledged that, in prior years,
he did use separate lines on his wage vouchers to enter his lost
time for Sundays.  [Id. at 114.]  He admitted that his earlier
testimony that he never listed separate entries for Sundays was
inaccurate, and he explained "it looked like a practice that I
was using at that time[,]" *i.e.*, in 2014.  [Id.]  Brown also
stated it was "so long ago from 2014 to 2010, 2011, 2012.  I
can't even remember yesterday."  [Id.]

g.    The overstatement of Brown's lost time for
April 14, 2014 resulted in an overpayment of $253.13.

10.  Cutter testified that Brown was not entitled to claim
any lost time for union leave on Tuesday, April 15, 2014 because
no one from his gang worked that day.[1] See Tr. Day 1 Trans.
(Cutter) at 121; Tr. Exh. 20 (enlarged excerpt of the Logbook
for 4/14/14 to 4/20/14); Tr. Exh. 24 (Logbook); see also Tr.
Exh. 22 (Government's summary chart of Charged Conduct

[1] Brown's "gang" refers to other McCabe machine operators
that worked the same shift as Brown.

20

Discrepancies for April 7, 14, 15, 16, 18, 2014); Tr. Exh. 32
(Government's summary chart of Charles Kimo Brown's Wage
Vouchers Compared with Other Machine Operators in His Gang on
Selected Dates, October 2010 - April 2014).  Thus, it would not
be possible for Brown to earn overtime pay, penalty overtime
pay, or double penalty overtime pay that day.  [Tr. Day 1 Trans.
(Cutter) at 116-17.]

     a.   Brown claimed 10.0 hours overtime pay for union
leave on April 15, 2014.  [Tr. Exh. 13 (Wage Voucher for 4/14/14
to 4/18/14).]

     b.   Brown does not dispute that the records indicate
no one in his gang worked on April 15, 2014, but Brown testified
that he called the dispatcher for his lost time for April 15,
2014, and whatever the dispatcher told him is what he wrote on
his wage voucher.  [Tr. Day 3 Trans. (Brown) at 117.]   In other
words, he attributes this overstatement of his lost time for
April 15, 2014 to dispatcher error.

     c.   The Court finds that Brown's claim of dispatcher
error is not credible because Brown made the same type of
overstatement numerous times from October 2010 to April 2014.
See id. at 117-18 (Brown's testimony regarding Investigator
Moenahele's testimony that there were nineteen occasions when
Brown claimed lost time wages even though no one in his gang, or
only a small number of machine operators in his gang worked that

day); Tr. Exhs. 39-40, 42-47, 49-56, 58-60 (sets of Brown's wage voucher, Logbook excerpt, and the paystubs for machine operators in Brown's gang for select days); see also Tr. Exh. 32 (Government's summary chart of Charles Kimo Brown's Wage Vouchers Compared with Other Machine Operators in His Gang on Selected Dates, October 2010 - April 2014).  The following are some examples of these instances:

1)    Brown was not scheduled to work on November 29, 2011 and was not entitled to claim pay for union leave on that day.  [Tr. Day 1 Trans. (Cutter) at 130; Tr. Exh. 24 (Logbook); Tr. Exh. 37 at BROWN_013219-20 (excerpt from the McCabe Logbook for 11/28/11 to 12/4/11).]  However, Brown claimed 7.5 hours of straight time for November 29, 2011.  [Tr. Exh. 11 at BROWN_006503 (Brown's Wage Voucher for the period from 11/27/11 to 12/2/11).]

2)    On April 10, 2012, Brown not entitled to claim pay for union leave because, although two people from Brown's gang worked that day, the person who was next in line after Brown to work that day - Derreck Kaneshiro ("Kaneshiro") - did not work.  [Tr. Day 1 Trans. (Cutter) at 131; Tr. Exh. 24 (Logbook); Tr. Exh. 38 at BROWN_013235-36 (Excerpt of Logbook for 4/9/12 to 4/15/12), BROWN_014241 (Kaneshiro's McCabe pay statement for the period from 4/9/12 to 4/14/12, showing no payment for 4/10/12).]  However, Brown claimed 7.5 hours of

22

straight time as lost time on his wage voucher.  [Tr. Exh. 38 at
BROWN_006520 (wage voucher for 4/8/12 to 4/13/12).]

        3)   No one on Brown's gang worked on May 11,
2012, and Brown was not entitled to claim pay for union leave on
May 11, 2012.  [Tr. Day 1 Trans. (Cutter) at 132; Tr. Exh. 24
(Logbook); Tr. Exh. 39 at BROWN_013237 (excerpt from the McCabe
Logbook for 5/7/12 to 5/13/12).]  Brown claimed 13.5 hours of
straight time for May 11, 2012.  [Tr. Exh. 11 at BROWN_006523
(Brown's Wage Voucher for the period from 5/6/12 to 5/11/12).]

        4)   No one on Brown's gang worked on May 15,
2012, and Brown was not entitled to claim pay for union leave on
May 15, 2012.  [Tr. Day 1 Trans. (Cutter) at 132-33; Tr. Exh. 24
(Logbook); Tr. Exh. 40 at BROWN_013238-39 (excerpt from the
McCabe Logbook for 5/14/12 to 5/20/12).]  Brown claimed 15.0
hours of straight time for May 15, 2012.  [Tr. Exh. 11 at
BROWN_006524 (Brown's Wage Voucher for the period from 5/13/12
to 5/18/12).]

        5)   Brown was not entitled to claim pay for
union leave from June 4, 2012 to June 10, 2012 because the
person who was next in line to work after him was not scheduled
to work and did not work.  [Tr. Day 1 Trans. (Cutter) at 142;
Tr. Exh. 24 (Logbook); Tr. Exh. 41 at BROWN_013238-39 (excerpt
from the McCabe Logbook for 6/4/12 to 6/10/12).]

a)  Brown was not scheduled to work on
June 5, 2012 and was not credited with any work hours for that
reason.  [Tr. Day 1 Trans. (Cutter) at 145-46; Tr. Exh. 24
(Logbook); Tr. Exh. 41 at BROWN_013238-39 (excerpt from the
McCabe Logbook for 6/4/12 to 6/10/12).]  Brown claimed 12.0
hours of straight time for June 5, 2012.  [Tr. Exh. 11 at
BROWN_006527 (Brown's Wage Voucher for the period from 6/4/12 to
6/9/12).]

b)  On June 8, 2012, Brown was not
scheduled to work but he was contacted to work and declined.  He
did not work on June 8, 2012 and was not entitled to claim pay
for union leave.  [Tr. Day 1 Trans. (Cutter) at 146-47; Tr.
Exh. 24 (Logbook); Tr. Exh. 41 at BROWN_013238-39 (excerpt from
the McCabe Logbook for 6/4/12 to 6/10/12).]  Brown claimed 15.0
hours of straight time for June 8, 2012.  [Tr. Exh. 11 at
BROWN_006527 (Brown's Wage Voucher for the period from 6/4/12 to
6/9/12).]

6)  No one on Brown's gang worked on May 7,
2013, and Brown was not entitled to claim pay for union leave on
May 7, 2013.  [Tr. Day 1 Trans. (Cutter) at 133; Tr. Exh. 24
(Logbook); Tr. Exh. 51 at BROWN_013284-85 (excerpt of the McCabe
Logbook for 5/6/13 to 5/12/13).]  Brown claimed 15.0 hours of
straight time for May 7, 2013.  [Tr. Exh. 11 at BROWN_006575
(Brown's Wage Voucher for the period from 5/5/13 to 5/9/13).]

7)   No one on Brown's gang worked on May 14, 2013, and Brown was not entitled to claim pay for union leave on May 14, 2013.  [Tr. Day 1 Trans. (Cutter) at 133-34; Tr. Exh. 24 (Logbook); Tr. Exh. 52 at BROWN_013288-89 (excerpt from the McCabe Logbook for 5/13/13 to 5/19/13).]  Brown claimed 16.0 hours of straight time for May 14, 2013.  [Tr. Exh. 11 at BROWN_006576 (Brown's Wage Voucher for the period from 5/12/13 to 5/17/13).]

8)   No one on Brown's gang worked on August 6, 2013, and Brown was not entitled to claim pay for union leave on August 6, 2013.  [Tr. Day 1 Trans. (Cutter) at 134; Tr. Exh. 24 (Logbook); Tr. Exh. 53 at BROWN_013300-01 (excerpt from the McCabe Logbook for 8/5/13 to 8/11/13).]  Brown claimed 7.5 hours of straight time for August 6, 2013.  [Tr. Exh. 11 at BROWN_006582 (Brown's Wage Voucher for the period from 8/4/13 to 8/9/13).]

d.   This Court also finds that Brown's claim of dispatcher error is not credible because Brown testified that there were occasions when the dispatcher would give him incorrect information about his lost hours.  [Tr. Day 3 Trans. at 68.]  However, he did not identify any specific instances.

e.   Brown's overstatement of lost time hours for April 15, 2014 resulted in an overpayment of $562.50.

25

11.  Cutter testified that Brown was entitled to claim 10.0 hours of overtime pay for union leave on Wednesday, April 16, 2014.  See Tr. Day 1 Trans. (Cutter) at 121; Tr. Exh. 20 (enlarged excerpt of the Logbook for 4/14/14 to 4/20/14); Tr. Exh. 24 (Logbook); see also Tr. Exh. 22 (Government's summary chart of Charged Conduct Discrepancies for April 7, 14, 15, 16, 18, 2014).  Valdez, the employee next in line after Brown to work, worked 9.0 hours of overtime and 1.0 hour of penalty overtime on April 16, 2014.  [Tr. Day 1 Trans. (Chock) at 200.] Thus, Brown was entitled to claim a total of 10.5 hours as lost time for April 16, 2014.  See Tr. Day 1 Trans. (Cutter) at 121.

a.  Brown claimed 11.5 hours overtime pay for union leave on April 16, 2014.  [Tr. Exh. 13 (Wage Voucher for 4/14/14 to 4/18/14).]

b.  Brown did not give specific testimony regarding the additional hours claimed on April 16, 2014.  The days that he did not specifically recall, Brown attributes to dispatcher error in the amount of hours given to him.  See, e.g., Tr. Day 3 Trans. (Brown) at 65-66 (When asked whether he could state "what the timekeeper gave [him] each and every day of" the two weeks in question, Brown responded: "No, I can't remember that.  The only time I remember is when they told me what the hours were for that week.").  The Court finds Brown's testimony regarding dispatcher error is not credible.

26

c.    The Court finds Cutter's testimony to be
credible.  He testified that, as far as he knew, the Logbook was
accurate.  Further, during the period relevant to this case,
Cutter was usually the dispatcher who would give Brown his lost
time.  [Tr. Day 1 Trans. (Cutter) at 160-61.]  When Cutter was
not the one answering such inquiries, he "was making sure that
the logbook was accurate to reflect what was being given."
[Id.]

d.    Brown has suggested that the differences between
his claimed lost time and the Logbook's notation for the hours
worked by the machine operator next in line after Brown to work
was justified because that machine operator submitted a
grievance about his hours and subsequently was credited with
additional time.  Further, sometimes adjustments after a
grievance are not made soon enough for the Logbook to be
corrected to reflect the adjustment.  See, e.g., Tr. Day 1
Trans. (Cutter) at 171-72.  Brown's position is that he would
have also been entitled to include that additional time on his
own wage voucher, because of the other machine operator's post-
grievance adjustment.  This position is rejected because Brown
has not presented any evidence that Valdez submitted, and
prevailed in, a grievance regarding his April 16, 2014 hours.

e.    Brown's lost time hours for April 16, 2014 were
overstated by 1.0 hour, resulting in an overpayment of $56.25.

27

12.   Cutter testified that Brown was entitled to claim 5.0 hours in overtime pay and 1.0 hour of straight time pay for travel as lost wages compensation for union leave on Friday, April 18, 2014 because Valdez, the employee next in line after Brown to work, worked 5.0 hours of overtime and 1.0 hour of straight time on April 18, 2014.  See Tr. Day 1 Trans. (Cutter) at 121; Tr. Exh. 20 (enlarged excerpt of the Logbook for 4/14/14 to 4/20/14); Tr. Exh. 24 (Logbook); see also Tr. Exh. 22 (Government's summary chart of Charged Conduct Discrepancies for April 7, 14, 15, 16, 18, 2014).

13.   Overtime pay is 1.5 times the straight-time rate. [Tr. Day 1 Trans. (Arakawa) at 34.]  Therefore, one hour of straight time is equivalent to approximately 0.7 hours of overtime, and Brown was entitled to claim 5.7 hours of overtime pay as lost wages compensation for April 18, 2014.

a.   Brown claimed 10.0 hours overtime pay for union leave on April 18, 2014.  [Tr. Exh. 13 (Wage Voucher for 4/14/14 to 4/18/14).]

b.   Brown did not give specific testimony regarding the additional hours claimed on April 18, 2014.  His position is that any overstatement in the exact number of hours was due either to dispatcher error or because Valdez received an upward adjustment in his hours after filing a grievance.  Brown's

28

contentions are rejected, for the reasons set forth as to the additional hour claimed on April 16, 2014.

c.   Brown's lost time hours for April 18, 2014 were overstated by 4.3 hours, resulting in an overpayment of $243.75.

14.   The total overpayment for the period from April 14, 2014 to April 18, 2014 was $1,115.65.

15.   William S. Akamine, Jr. ("Akamine"), Vice President of Compliance and Risk Management for Hawaii State Federal Credit Union ("HSFCU"), testified that Brown deposited a check by the Longshore Division in the amount of $2,057.64, payable to Brown and dated April 14, 2014, into Brown's personal account at HSFCU on April 16, 2014.  [Tr. Day 1 Trans (Akamine) at 73-75; Exh. 23 at HSFCU_000892 (copy of check), HSFCU_000890 (copy of deposit slip).]

16.   Akamine testified that Brown deposited a check by the Longshore Division in the amount of $2,057.63, payable to Brown and dated April 21, 2014, into Brown's personal account at HSFCU on April 21, 2014.  [Tr. Day 1 Trans (Akamine) at 75-76; Exh. 23 at HSFCU_000894 (copy of check), HSFCU_000893 (copy of deposit slip).]

## CONCLUSIONS OF LAW

1.   The Longshore Division of the ILWU, Local 142 was and is a labor organization required to file annual reports with the

Secretary of Labor and to keep records for information required
to be reported annually.

2.   Wage vouchers submitted by union officials for
reimbursement by the Longshore Division of the ILWU, Local 142
of lost wages incurred when performing union duties are records
required to be kept by the Longshore Division of the ILWU,
Local 142 pursuant to 29 U.S.C. § 436.

3.   Brown was the secretary-treasurer and therefore a
union officer of the Longshore Division, and he had a fiduciary
duty to his union.

4.   Brown made a false entry in a wage voucher required to
be kept by his union pursuant to federal law, and the wage
voucher was for the period from April 7 to April 11, 2014.
Specifically, Brown claimed 14.5 hours of overtime for lost
wages compensation on April 7, 2014 but was legally entitled to
claim only 9.0 hours of overtime as lost wages compensation for
April 7, 2014.

5.   Brown's overstatement of his hours for April 7, 2014,
resulted in an overpayment of $309.38 for the period from
April 7, 2014 to April 11, 2014.

6.   The $309.38 is close enough to the amount alleged in
Count 2 to be within "the approximate amount of $393.75."  See
Indictment at pg. 4.

7.   Brown made false entries in a wage voucher required to be kept by his union pursuant to federal law, and the wage voucher was for the period from April 14 to 18, 2014. Specifically:

a.   Brown claimed 14.5 hours for lost wages compensation on April 14, 2014 but was legally entitled to claim only 10.0 hours of overtime as lost wages compensation for April 14, 2014.  This resulted in an overpayment of $253.13 for April 14, 2014.

b.   Brown claimed 10.0 hours for lost wages compensation on April 15, 2014 but was not legally entitled to claim any hours as lost wages compensation for April 15, 2014. This resulted in an overpayment of $562.50 for April 15, 2014.

c.   Brown claimed 11.5 hours for lost wages compensation on April 16, 2014 but was legally entitled to claim only 10.5 hours of overtime as lost wages compensation for April 16, 2014.  This resulted in an overpayment of $56.25 for April 16, 2014.

d.   Brown claimed 10.0 hours for lost wages compensation on April 18, 2014 but was legally entitled to claim only 5.7 hours of overtime as lost wages compensation for April 18, 2014.  This resulted in an overpayment of $243.75 for April 18, 2014.

31

8.    Brown's overstatement of his hours for April 14, 15, 16, and 18, 2014, resulted in a total overpayment of $1,115.65 for the period from April 14, 2014 to April 18, 2014.

9.    The $1,115.65 overpayment is close enough to the amount alleged in Count 4 to be within "the approximate amount of $1,181.25."  See Indictment at pg. 5.

10.  Brown's repeated overstatement of his entries on wage vouchers from 2009 to 2014 reflects a pattern, which shows that his false entries from April 7 to 11, 2014, and April 14 to 18, 2014 were not due to mistake or confusion.  Cf. United States v. Harris, CR. NO. 17-00001 HG-01, 2018 WL 1902361, at *3 (D. Hawai`i Apr. 20, 2018) ("evidence of a history or pattern of similar transactions is probative in fraud cases and it is admissible to prove intent, plan, knowledge or absence of mistake" (citing United States v. Decinces, 808 F.3d 785, 790 (9th Cir. 2015))), aff'd, 842 F. App'x 28 (9th Cir. 2020).

11.  Brown's false entry on his wage voucher for April 7, 2014 was done willfully and not due to mistake or confusion.

12.  Brown's false entries on his wage voucher for April 14, 15, 16 and 18, 2014 were each done willfully and not due to mistake or confusion.

13.  The Longshore Division check, dated April 14, 2014, that Brown deposited to his personal account represented payment for his wage voucher for the period from April 7, 2014 to

32

April 11, 2014.  The check included the $309.39 overpayment, and by depositing the overpayment, Brown embezzled and converted for his own use union funds that he was not entitled to receive.

14.  As to the $309.39 overpayment, Brown embezzled and converted it willfully and with the intent to deprive the Longshore Division of its funds.

15.  The Longshore Division check, dated April 21, 2014, that Brown deposited to his personal account represented payment for his wage voucher for the period from April 14, 2014 to April 18, 2014.  The check included the $1,115.65 overpayment, and by depositing the overpayment, Brown embezzled and converted for his own use union funds that he was not entitled to receive.

16.  As to the $1,115.65 overpayment, Brown embezzled and converted it willfully and with the intent to deprive the Longshore Division of its funds.

## CONCLUSION

For the foregoing reasons, this Court FINDS and CONCLUDES that the Government has established, beyond a reasonable doubt, that Brown is GUILTY of Counts 1, 2, 3, and 4 of the Indictment.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, November 1, 2022.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

<u>UNITED STATES OF AMERICA VS. CHARLES KIMO BROWN</u>; CR 19-00046
LEK; DECISION